S. S. HARRELL, Administrator, &c. v. MEREDITH WATSON
and others.

*Bonds* require no consideration.

The sale of a slave in September 1864, in North Carolina, constituted
*a valuable consideration* for any promise made to pay for the same.

The Emancipation Proclamation of President Lincoln, and the Act of
Congress of July 1862, by their terms operated only upon particular
slaves, and did not affect *the institution of slavery*; So also, the order
of General Schofield, made after the Surrender.

The buying and selling of slaves in the ordinary course of business, in
North Carolina, in 1864, was then against neither good morals, nor
public policy; and no retroactive effect to that end can be attributed
to the subsequent emancipation of slaves, and abolition of the in-
stitution of slavery by law.

(*Buie* v. *Parker, ante* 131, *Hooker* v. *Phillips*, Phil. Eq. 193, *Woodfin* v.
*Sluder*, Phil. 200, cited and approved.)

DEBT, tried before *Pool, J.*, at Spring Term 1869 of the
Superior Court of HERTFORD.

The plaintiff declared upon a plain bond, "for value re-
ceived" promising to pay to him one thousand dollars, with
interest from date, and dated the 26th day of September, A.
D. 1864.

The defendants pleaded General issue, Payment and Set off.

The bond had been given in part payment of the price of a
slave, purchased by Watson at an Administrator's sale by
the plaintiff, in Hertford county on the day of the date. The
terms of sale were, that purchasers might pay in Confederate
currency, to the amount of $1,000; and, for any sums in excess
payment would be required in notes of the banks of this State,
and for such excess bonds must be given with good security,
bearing interest from the day of sale. At the sale Watson
purchased a negro boy under 21 years of age, for the sum of
$2,000, and having paid one-half thereof, gave bond for the
other half, according to the terms of sale. The value of bank
notes, in gold, was shown to be 25 per cent., or, as one to four.

Upon the above case, the Court instructed the jury that the

plaintiff was entitled to recover the value of the bond in gold, and accordingly there was a verdict and judgment for $250 *in gold*, with damages for detention, &c.

The defendants excepted to the ruling, and having moved for a new trial, &c., appealed.

*Yeates* and *Barnes*, for the appellants.

1. The consideration of this bond may be inquired into. Acts of Assembly of 1866, chs. 38 and 39.

2. The bond was given after the Emancipation Proclamation of President Lincoln, a war measure vital to the Government. See also Acts of Congress of 1862, ch's. 40, 111, 195, 201, Milligan's case, 4 Wall. 2, and C. J. Chase's dissenting opinion therein.

3. The particular result of the war instead of discontinuing this war measure, actually ratified and maintained it *ab initio*.

4. The negro here was under age, and if the construction be that the Proclamation was limited to such as availed themselves of it and escaped into the lines, the Courts will give infants all the benefits of a presumption that they would have escaped if of full age. Laches will not be imputed to them.

5. As matter of public history the military forces of the United States frequently invaded and at one time overran the district where this boy resided previously to the sale.

6. The Courts of North Carolina being wrongful when Harrell was appointed administrator, he was not such at the sale, and so could not sell, or take a valid bond, and the Convention of 1865 had not the power to create a contract by the defendants without their consent.

7. A debt created in purchasing a slave, is an incident to slavery, and disappears with its principal.

8. Under the Act of the Legislature the recovery should have been limited in amount by the value of the thing bought, which here is to be measured by the time of actual service. At all events the verdict and judgment *for gold*, are incorrect: and should have been for United States currency.

They cited *Hayley* v. *Hayley*, Phil. Eq. 180, *Ex parte* Hughes, Phil. 57, *Buie* v. *Parker, ante* 131, *Blossom* v. *Van Amringe*, Phil. Eq. 133, *Wiley* v. *Worth*, Phil. 171.

9. When were the slaves in North Carolina emancipated? Would the sale of one after the surrender and before the passage of the ordinance of emancipation, have been valid? If not, why?

*Smith Contra.*

The proclamation of the President of the United States emancipating the slaves in this State on the first day of January 1863, was an exercise of force called for by the exigencies of war, and finding its justification in the principles of law applicable to a state of war. It is valid so far and no farther than it can be made effectual by force. The slave in question was not in fact set free by force, and therefore never legally became free until the adoption of the ordinance of emancipation by this State. Dana's Wheaton, Sec. 347, Note 8, latter part.

This view is sustained by,

1. The requirement by the Executive of the United States of an ordinance of emancipation.

2. The condition inserted in the amnesty proclamation, and the special pardons issued.

This Court has virtually so held in reference to the hire of a slave in 1865. *Woodfin* v. *Sluder*, 1 Phil. 200. But, if without consideration, the bond is valid, and no defence is available in this action.

PEARSON, C. J. We listened with pleasure to the argument of Mr. Yeates. He was candid, and seems to have investigated the subject with much diligence; but we cannot concur in his conclusions.

He says, the bond is void for want of a consideration. The reply is: 1st. A bond needs no consideration. The solemn act of sealing and delivering is a *deed, a thing done*, which, by the rule of the common law, has full force and effect, without

any consideration. *Nudum pactum* applies only to simple contracts—deeds need no consideration, except such as take effect under the doctrine of uses, or such as are made void by the statutes of Elizabeth as against creditors and purchasers for valuable consideration, but are valid, as at common law, between the parties.

This is a misapprehension of the law into which many of the profession seem to have fallen by reason of inaccuracy in Blackstone's Commentaries, who, we take occasion to say, is a popular, and not an accurate text writer, like Coke or Fearne. For instance, Blackstone adopts the definition given by Coke of a deed—" an instrument of writing, on parchment or paper, sealed and delivered "—and yet he afterwards goes on to say, " a deed must be supported by a sufficient consideration." His remark is evidently to be understood, as having reference to deeds taking effect under the doctrine of uses, and to the statutes of Elizabeth. For, beyond all question, a deed is binding between the parties without any consideration. 2nd. There was, in our case, a valuable consideration. The slave bargained for, was delivered to the defendant at the date of sale in September 1864, and he had his services until 1865; and upon the supposition that the thing sold, to-wit: the negro, was in fact a freeman, and not the subject of sale from and after the proclamation of Jan. 1, 1863, the defendant had notice of this fact, as well as the plaintiff, and according to the rule of law and of equity, and of justice in its ordinary sense, " he who is to have the gain should bear the loss," as is said, *Buie* v. *Parker, ante* 131. The matter depended upon future contingencies, and the defendant gave his bond for the price, and took the chances.

The reference made by Mr. Yeates to the law authorizing an inquiry in regard to contracts payable expressly or impliedly in currency, and allowing a jury to fix the value thereof, has no application to our case, for it turns not on the value, but on the *validity* of the obligation sued upon.

In the second place, Mr. Yeates took the position that the bond was void as against the policy of the law, in this: By the proclamation of the President, of January 1st, 1863, all slaves

are set free from and after that date. So that at the time of the sale, the person sold was not a slave, but a free man.

Admitting the premises, we do not see how the conclusion follows. Say, according to the view of President Lincoln, the person sold was a free man at the time of the sale, how could it obstruct his policy, that the supposed title to the person as a slave was afterwards transferred from A. to B. Certainly it could make no difference in legal effect, whether the individual was held as a slave by the one or the other, provided, under the existing state of things, the individual was to be held as a slave in the same locality.

But we do not admit the premises, to-wit: that by force of the proclamation of the President, all slaves are set free from and after January 1st, 1863.

By the act of Congress of July, 1862, "The slaves of persons who shall hereafter give aid to the rebellion, taking refuge within the lines of the army," and "all slaves captured from such persons, or deserted by them, and coming under the control of the government of the United States," and "all slaves of such persons, found or being within any place, occupied by rebel forces, and afterwards occupied by the forces of the United States, shall be deemed captives of war, and shall be forever free of their servitude, and not again held as slaves."

This act of the *legislative* branch of the government of the United States is, by its terms, confined to slaves personally, and applies only to such individuals as may come under the control of the government. It recognizes the existence of slavery, and cannot, in any point of view, have the effect of *abolishing and making unlawful the institution of slavery* in the States where the institution then existed and was recognized by law.

The proclamation of the President is simply a war measure of the *executive* branch of the government, called for in order to announce what States were in rebellion, and to what localities the act of 1862 was applicable. It does not, perhaps, and indeed the President, without the concurrence of the legislative branch of the government, could not arrogate to him-

self the power, as a war measure, to abolish and make unlaw-
ful the institution of slavery in the States declared by him to
be in rebellion.  So far from assuming power to do so, the
proclamation is, by its terms, confined to slaves personally,
and in its practical effect it was limited to such slaves individ-
ually as should come under the control of the armies of the
United States.  So the *institution of slavery* was not abolished
or made unlawful, either by the act of 1862, or by the procla-
mation of the President.  See " Whiting on the War Powers
of the President," 5–6.

In like manner the military Order of Gen. Schofield, after
the Surrender, simply had the effect of announcing, that the
whole State was then under the control of the army of the
United States, and that by force of the act of 1862, and the
proclamation of the President, and the order of Gen. Scho-
field, as military commander, all persons then held as slaves in
the State of North Carolina were free and should be so
treated.  This operated upon persons then held as slaves in
the State of North Carolina.  But surely a military order could
not have effect of abolishing or making unlawful the institu-
tion of slavery.  That was left as an act that could only be
done by the *government* of the United States, or by an ordi-
nance of a convention of the people of the State.  Apart
from the action of the *government* of the United States, and
the convention of the State, there could have been, in legal
contemplation, no more wrong in procuring other slaves to
supply the place of those taken from us by the results of the
war, than in buying other property to put in the place of that
taken from us by the armies of the United States and of the
Confederate States.

So our case comes back to this point; in April, 1864, the
plaintiff, as administrator, in the county of Hertford, which
was not within the lines or under the control of the army of
the United States, offers for sale, according to the laws of the
State, and does sell at auction, a negro man slave.  The de-
fendant becomes the purchaser, pays a part of the price, takes
the slave, and executes his bond for the balance of the price.
In what point of view can this transaction be considered

against public policy, or as so violating good morals as to authorize a court of justice to refuse to enforce the contract?

As is said *Phillips* v. *Hooker*, Phil. Eq. 193 "the transaction was one in the ordinary course of business, done without any reference to the operations of the government of the United States, or of the Confederate States, without any criminal intent to aid the rebellion, and to hold the contract void, will simply have the effect to encourage dishonesty."

It was not against the public policy of the State of North Carolina, according to the laws then existing and recognized both by the wrongful government then in power, and the rightful government which was, for the time, deprived of its power. It was not against the policy of the act of Congress of 1862, nor of the proclamation of the President; for, as we have seen, it could not affect that policy, in localities not under the control of the armies of the United States, whether a person was held as a slave by A or B, provided, under the circumstances, he was to be the slave of some person. So far as good morals are involved, the matter is not to be viewed, as we conceive, from a standpoint, where the institution of slavery is deemed wicked and in violation of the laws of God and of the rights of man, but from a standpoint where the institution was considered as established and made lawful by the laws of the State, and recognized and protected by the Constitution of the United States, and had been handed down and acted upon from father to son among our people, from the first settlement of the colony of Carolina.

The Court is unable to see any ground, either on the score of public policy or of good morals, upon which it should refuse to enforce this contract, and allow the defendant to escape the payment of a just debt.

*Woodfin* v. *Sluder*, Phil. 200, is in point. True, the question was not made, but that proves that it had not entered into the head of any one to conceive that the act of hiring a slave or of selling a slave in North Carolina outside of the lines of the United States Army, was against public policy, or against good morals.

The idea, that the subsequent action of Congress and the

·ordinance of our Convention, can have the effect by relation, ·or by *post-liminy*, to enlarge the operation of the act of 1862 and of the proclamation, so as to give to those measures the effect of abolishing slavery, and making the institution unlawful at the date of this transaction, and consequently, making the .act of the parties wicked and against good morals, has, in our ·opinion, nothing sound to rest on, either in law, ethics, or good sense. "Coming events cast their shadows before," and "events accomplished" do not cast a shade *behind*, so as to· make unlawful that which, at the time it was done, was not against law. This would violate the immutable principle of .justice adopted in our Constitution, by which *ex post facto* laws are fobidden.

PER CURIAM.                                    Judgment affirmed.