ELECTROVA COMPANY AND S. R. RACKLEY v. THE SPRING GARDEN INSURANCE COMPANY.

(Filed 11 October, 1911.)

1. Insurance, Fire—Vendor and Vendee—Public Policy—Action Upon Insurance Policy—Damages.

A manufacturer and vendor of a piano which mechanically plays tunes when a nickel is inserted in a slot, took out a "floating policy" on his stock of such pianos, and his agent, in the hope of effecting a sale, placed one of them with the owner of a house of ill-fame. Under these conditions the house caught fire and the piano was destroyed, it appearing from the examination of the remains of the slot machine that some money had been put in by the guests of the house: *Held*, the title and right of possession remained in the vendor, the vendee was in nowise a party to the insurance contract, and the question of public policy is too remote to be considered on the question of recovery in an action brought by the vendor against the insurer upon the policy contract. *Brown v. Kinsey*, 81 N. C., 245, cited and approved.

2. Insurance, Fire—Policy Contracts—Interest of Parties—Public Policy.

Contracts will not be declared void as against public policy unless the case is clear and free from doubt and the injury to the public is substantial and not theoretical or problematical, and the advantage or interest of either party will not be considered.

3. Insurance, Fire—Policy Contract—Collateral Acts.

A contract will not be set aside as being against public policy if the illegal act complained of is but collateral to it, for if such act has no direct connection with the contract sought to be set aside, the contract is not affected by it.

**4. Insurance, Fire—Policy Contract—Independent Action—Public Policy.**

If the plaintiff, in his action upon a contract, resisted upon the ground of public policy, does not require the aid of the illegal act to establish his claim, he may recover.

**5. Same.**

A floating policy of insurance issued to a vendor of pianos is lawful, for a valid purpose and supported by a consideration, and the vendor may recover upon the contract in his action against the insurer for the loss by fire of one of the pianos covered by the policy, independent of any question of public policy arising from the fact that he had placed it in a house of ill-fame with the hope of selling it to the owner, and while there under these conditions the piano was destroyed.

APPEAL from *Peebles, J.,* at March Term, 1911, of LENOIR. ·

This is a civil action to recover on a policy of insurance on a piano. These issues were submitted to the jury:

1. Did the defendant insure the piano of the plaintiffs, as alleged in the complaint? Answer: Yes..

2. If so, what sum, if any, are plaintiffs entitled to recover of the defendant for its destruction by fire, if it was destroyed? Answer: $248.75. Destroyed by fire.

3. Was the piano an electric one, played by putting a nickel or dime in the slot? Answer: Yes.

4. Was said piano at the time it was burned placed by plaintiffs in the house of a woman who kept a house of ill-fame, for trial, with a view of selling the same to the keeper of said house, and with the knowledge that said house was a house of ill-fame? Answer: Yes; the day before the fire.

5. After the fire, did plaintiffs take out of the piano any money put in the slot? Answer: Yes.

6. If so, how much? Answer: $1.25.

Upon the verdict plaintiffs and defendant moved for judgment. The court rendered judgment for defendant. Plaintiffs excepted and appealed.

*G. V. Cowper and J. Paul Frizzell for plaintiffs.*

*Simmons & Ward, Loftin & Dawson, McLean, Varser & Mc-Lean for defendant.*

BROWN, J.  The Electrova Company is a corporation engaged in the manufacture and sale of a piano which plays tunes by mechanical means when a nickel is inserted in a slot.

On 11 April, 1910, plaintiff's sales agent, Rackley, placed an instrument in a house of ill-fame in Kinston belonging to Mabel Page, for trial, with the view to sell it to her.  It was not placed there to be operated for plaintiffs, but only with the purpose to induce the proprietress to buy it eventually.  About 6 P. M. on 12 April the house caught fire and the piano was practically destroyed by the flames.  The charred body of the piano was opened and the agent Rackley took out $1.25 in nickels, which had been put in the slot by visitors of the house.

On 12 April, 1910, in the town of Greenville, the agent Rackley took out from defendant's agent there a "floating policy" insuring all plaintiff's instruments in Greenville and Kinston, effective after 12 o'clock noon, that day.

The defense is that the contract of insurance between plaintiff and defendant was void because the piano had been placed in a house of ill-fame, with a view to selling it to the proprietress. It is urged that such a transaction is against public policy to such an extent that it avoids the policy of insurance on the piano.  The defense has the merit of novelty, at least.  But we think it must fail, for two reasons:  (1) The theory of the defense in that the piano was insured in aid and furtherance of a contract or agreement entered into between the plaintiffs and Mabel Page which was against public policy.

The defendant fails to establish any contract or agreement of any sort between the plaintiff and Page.  There was no contract or agreement to sell the piano.  It was placed in her house only in the hope of a sale.  The title and right of possession was never out of the plaintiffs.  They had the right to remove it at any moment, and by legal process if necessary. The instrument was not placed in the house to earn nickels for plaintiffs, although Rackley found some in its remains.  But if it had been placed there, as slot machines frequently are placed in public places, to earn nickels for the owner, the plaintiffs would not have thereby forfeited their title to the property.

The insurance policy was not taken out in aid and furtherance of a contract and agreement entered into between plaintiffs and Mabel Page, for there was none entered into, moral or immoral.

The rule of law which the defendant invokes applies only to executory contracts or agreements which are to be performed in the future, and not to transactions which are past and closed. *Brown v. Kinsey,* 81 N. C., 245.

(2) The effect upon the public interest, under the facts of this case, is too remote entirely to justify a court in refusing its aid to plaintiff to enforce the payment of the policy.

The reason that some contracts and agreements are declared void as against public policy is because the enforcement of them by the courts would have a direct tendency to injure the public good. The law does not consider the advantage or interests of either party to the contract, but acts only from considerations of the public good. *Harrell v. Watson,* 63 N. C., 454; *Brown v. Kinsey, supra; Collins v. Blanten,* 1 Smith Leading Cases, 153.

It has been said by learned judges and text-writers that a court should declare a contract void as against public policy only when the case is clear and free from doubt and the injury to the public is substantial and not theoretical or problematical. *Navigation Co. v. Dumas,* 181 Fed., 782; *Cox v. Hughes,* 102 Pac. Rep., 956.

Where the contract or agreement sought to be enforced has no direct connection with the illegal act, but is collateral to it, then the contract is not tainted or affected by the illegal act. The principle of law is thus stated by *Chief Justice Marshall:* "Where a contract grows immediately out of and is connected with an illegal or immoral act, a court of justice will not lend its aid to enforce it. But if the promise be entirely disconnected with the illegal act, and is founded on a *new* consideration, it is not affected by the act, although it was known to the party to whom the promise was made, and although he was the contriver and conductor of the illegal act." Again the *Chief Justice* expresses the same principle in simpler language when

he says: "A new contract, founded on a new consideration, although in relation to property respecting which there had been unlawful transactions between the parties, is not itself unlawful." *Armstrong v. Toler,* 24 U. S., 257. Where the connection between the illegal act and the agreement sought to be enforced is not direct, but remote, the latter will be upheld.

The decision of this Court in *McKesson v. Jones,* 66 N. C., 264, is founded in the principles laid down by *Chief Justice Marshall,* and recognized in the English courts by *Mellish, L. J.,* in *Taylor v. Bowen,* 1 Q. B. D., 291. This was an action on a note given for the rent of land leased for the purpose of raising food for laborers in the employ of the Confederate Government. In the opinion *Mr. Justice Rodman* says: "In the present case this aid given the rebellion was much more indirect; it was at best two steps further off. It was not a sale of military materials, nor even a sale of provisions to laborers making material, but a lease of land upon which provisions might be raised, which might be applied to feed laborers engaged in an unlawful occupation."

Again we read from the same case: "It is possible to foresee and calculate the direct consequences of an act. If we attempt to follow it out into its direct and more remote consequences, our reasoning becomes soon uncertain, and after a few steps altogether unsatisfactory. When we confine ourselves to direct consequences, we feel that we are treading on tolerably firm ground; but if we go further, there is no telling into what calculations of remote and merely possible consequences we may not be compelled to plunge."

In *Powell v. Smith,* 66 N. C., 401, this Court held that where a principal and surety gave a note for a consideration against public policy, and the surety paid same at the request of the principal, the principal giving a new note to the surety, the latter note could be collected.

In *Poindexter v. Davis,* 67 N. C., 114, *Reade, J.,* says: "The facts in this case are, that the county had contracted a debt to equip soldiers in the Confederate service, and then contracted this debt to pay that off. The first transaction was clearly in

aid of the rebellion, and for that reason illegal. But how did it aid the rebellion to pay that debt off? . . . The argument is a refinement, and the illegality too remote."

The true test of the illegality of a contract is thus stated by this Court in *S. v. Bevers,* 86 N. C., 595: "The principle upon which the courts refuse their aid in such cases is this: No court will lend assistance to one who founds his cause of action upon an illegal act. . . . But to put this principle into operation in any particular case it must appear that the very party who is seeking aid from the court participated in the unlawful purpose. Indeed, it is said that the very test of its application is whether the plaintiff can establish his case otherwise than through the medium of an illegal transaction, to which he was himself a party."

It has been also held by other jurisdictions that if the plaintiff does not require the aid of an illegal transaction to establish his claim, he may recover. *In re Bunch Co.,* 180 Fed., 519, and cases cited; *Fruit Association v. Snelling,* 141 Cal., 713.

There are cases which hold that if this piano had been sold to Mabel Page to enable her to better carry on and conduct a house of ill-fame, the seller could not recover in an action for the purchase price. *Furniture Co. v. Alstein,* 51 L. R. A., 889; *Reed v. Brewer,* 90 Tex., 148. Those cases are founded upon the principle we have adverted to, that the plaintiff could not make out his case without resorting to and putting in evidence an illegal transaction.

But nowhere can there be found a case, so far as we are advised, which holds that if Mabel Page had purchased the piano she could not have lawfully insured it, and recovered the insurance had it been destroyed by fire.

It is very generally held to be vicious and in some States it is made a crime for the owner of a house to lease it for immoral purposes. Yet it has never been held that if the house, so leased, is insured and destroyed by fire, the owner cannot recover on his policies.

There is no direct connection between the immoral or unlawful act of leasing and the lawful and (so far as the public is

concerned) harmless act of insuring. The evil effect upon the public interests is entirely too remote and problematical to avoid the lawful contract of insurance.

Fire insurance contracts are recognized by the laws of all civilized nations. They are based upon a cash consideration, and from their very character cannot have an immoral tendency. They are not entered into to promote vice, but solely to secure the owner of property against loss. The contract sued on is based upon a new and cash consideration and not upon an immoral one. Neither do plaintiffs have to resort to an immoral or illegal transaction to make out their cause of action. How the taking out of this floating policy upon all their pianos in Kinston and Greenville could in any way aid and abet the sale of one of the pianos so insured to Mabel Page is difficult to see. She could derive no benefit from the insurance and it was therefore no inducement for her to purchase. The moment the piano became her property, it lost the protection of the plaintiff's floating policy and was no longer insured.

No public interest is involved, much less injured, by the enforcement of this contract. And we think what is said by the Supreme Court of California in the case cited may well apply to this: "Parties should be careful about making contracts, but when once made the courts will not relieve them for light or trivial reasons. Public policy is better served by leaving the parties and their rights to be measured by the terms of their contract."

Upon the issues as answered by the jury the plaintiff, the Electrova Company, is entitled to judgment for $248.75, interest and costs. Let the cause be remanded with instructions to the Superior Court of Lenoir County to enter judgment accordingly.

Reversed.