The **HARRISON AGENCY, INC.** and **Tony B. Harrison, Plaintiffs,**

v.

The **PACIFIC MUTUAL LIFE INSURANCE COMPANY, Defendant.**

No. ST–C–86–150–P.

United States District Court, W.D. North Carolina, Statesville Division.

Jan. 10, 1989.

Michael D. Meeker, Greensboro, N.C., Dan R. Murray, Sparta, N.C., for plaintiffs.

Alan W. Duncan, Smith, Helms, Mulliss & Moore, Greensboro, N.C., for defendant.

## ORDER

ROBERT D. POTTER, Chief Judge.

### I. PRELIMINARY STATEMENT

THIS MATTER is before the Court on Defendant's Motion for Summary Judgment, filed January 27, 1988, pursuant to Rule 56 of the Federal Rules of Civil Procedure. On September 30, 1988, a hearing on this motion and other outstanding motions was conducted, the undersigned presiding.[1] Jim W. Phillips, Jr., Michael D. Meeker, and Dan R. Murray appeared on behalf of Plaintiffs, and Alan W. Duncan and Jon Berkelhammer appeared on behalf of Defendant. After hearing counsel's arguments, the undersigned took the outstanding motions under advisement. For the reasons that follow, Defendant's Motion for Summary Judgment will be granted in part and denied in part, and this Court will dismiss Plaintiffs' breach of contract claim, promissory estoppel claim, and tortious interference with business relations claim.

### II. NATURE OF THE CASE

This case involves a group dental insurance program that Plaintiffs—a licensed insurance agent and his company—offered to state and local governmental employees in North Carolina. Plaintiffs allege that Defendant is liable to them because they spent their time, money, and effort organizing and implementing the program in reliance upon at least one of Defendant's representatives, who assured them that De-

---

1. This Court also conducted a hearing on (1) Plaintiffs' Motion to Compel Discovery Responses to Plaintiffs' First Set of Interrogatories and Request for Production of Documents, filed August 14, 1987, (2) Defendant's Motion to Compel Production of Tax Returns, filed September 11, 1987, (3) Defendant's Second Motion to Compel Discovery, filed October 16, 1987, (4) Defendant's Motion for Sanctions, or, in the Alternative, Motion in Limine, filed October 16, 1987, and (5) Plaintiffs' Motion to Compel Defendant's Responses to Plaintiffs' Third Set of Interrogatories and Requests for Productions of Documents, filed October 19, 1987. An order filed on December 23, 1988 disposed of all of these motions.

fendant would underwrite the program.[2] Defendant contends that Plaintiffs are entitled to nothing because the program—as structured and offered—violated both North Carolina's insurance laws and Defendant's risk-assessment guidelines and because Defendant never agreed to underwrite the program.

Plaintiffs allege Defendant is liable to them under one or more of these theories: (1) fraud, (2) breach of contract, (3) promissory estoppel, (4) tortious interference with business relations, (5) unfair trade practices, and (6) negligent supervision of employees. Plaintiffs claim actual damages in the amount of $4,900,000.00 for out-of-pocket expenses, damage to business reputation, loss of goodwill, lost profits, and lost commissions and fees. In addition, Plaintiffs claim they are entitled under Sections 75–16 of the General Statutes of North Carolina to treble damages in the amount of $14,700,000.00 because Defendants allegedly engaged in unfair and deceptive trade practices. Plaintiffs also claim they are entitled to reasonable attorney's fees and punitive damages.

Defendant has counterclaimed against Plaintiffs for Defendant's losses, which Defendant asserts it has suffered because it has issued allegedly unprofitable individual dental insurance policies to people Plaintiffs solicited before Defendant communicated to Plaintiffs its unwillingness to underwrite the group dental insurance program. Defendant asserts these losses—which allegedly will exceed $500,000.00—were caused by Plaintiffs' negligence, misrepresentations, tortious interference with business relations, and other "wrongful actions."

This Court's subject-matter jurisdiction over this case is based upon the parties' complete diversity of citizenship, 28 U.S.C.A. § 1332(a) (West Supp.1988), and, therefore, this Court must apply the substantive law of the State of North Carolina, 28 U.S.C.A. § 1652 (West 1966 & Supp.1988) ("Rules Decision Act"); *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also* N.C.Gen.Stat. § 58–28 (1982) ("All contracts of insurance on property, lives or interests in this State shall be deemed to be made therein, and all contracts of insurance the applications for which are taken within the State shall be deemed to have been made within this State and are subject to the laws thereof."). The parties have recognized this and have cited North Carolina statutes and cases in their briefs.

### III. FACTS [3]

Plaintiff Tony B. Harrison ("Harrison") is a citizen and resident of Allegheny County, North Carolina. For all times relevant to this case, Harrison was a licensed insurance agent in North Carolina; he has been involved in the insurance business since 1974.[4] Plaintiff The Harrison Agency, Inc., ("the Agency") is a corporation—begun by Harrison—organized and existing under the laws of the State of North Carolina, with its principal office and place of business in Mount Airy, North Carolina. The Agency's business was to solicit and train independent insurance agents who would sell insurance on behalf of insurance companies for which Harrison was a general agent.[5]

**2.** In the insurance business, an underwriter is "the one assuming a risk in return for the payment of a premium." *Black's Law Dictionary* 1369 (5th ed. 1979).

**3.** It is interesting to note that in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court recognized that Rule 56 of the Federal Rules of Civil Procedure does not require the trial judge to make findings of fact, although such findings may be helpful to a reviewing court. *Id.* 106 S.Ct. at 2511 & n. 6. Therefore, the following exposition of the facts is not meant to be exhaustive, and it does not attempt to identify all the genuine issues of material fact in this case which preclude the entry of summary judgment on Plaintiffs' First, Fifth, and Sixth Claims for Relief.

**4.** Harrison Depo. at I–75 to 76 (the Roman numeral corresponds to the deposition volume, and the Arabic numeral following the hyphen corresponds to the page number of that volume). Harrison was required to take a state test before he received his license, although the test may not have been very rigorous. *Id.*

**5.** Harrison, as the general agent, would receive an "overwrite" on all policies written by the

Defendant Pacific Mutual Life Insurance Company ("Pacific Mutual") is a corporation organized and existing under the laws of the State of California, with its principal place of business in Newport Beach, California; it is duly authorized and registered to do business in the State of North Carolina.[6] Pacific Mutual is an insurance company offering life, health, and disability insurance. It has an "A-plus" rating from BEST Insurance guidelines.[7]

In late 1984, Harrison became interested in providing dental insurance to certain state government employees in North Carolina.[8] Harrison sought to have the dental insurance program underwritten by an insurance company with an A plus rating.[9]

In late May or early June of 1985, Harrison was given a booklet describing a voluntary dental program in Kentucky underwritten by Pacific Mutual.[10] Harrison telephoned Pacific Mutual in California, identified himself, and explained that he wanted to speak to someone about the possibility of having Pacific Mutual underwrite a dental insurance program for North Carolina state employees.[11] Harrison was referred to Peter Kremers ("Kremers"), a Pacific Mutual sales representative in San Diego, California.[12]

Harrison explained to Kremers that he was looking for an insurance company to underwrite a group dental insurance policy for North Carolina state employees. Kremers expressed some interest in the proposed program—apparently because he was aware that Pacific Mutual had underwritten other group dental insurance programs—and told Harrison that he should call Pacific Mutual's Atlanta office and speak with David Westfall ("Westfall"), Pacific Mutual's Regional Vice President for the Eastern portion of United States.[13]

Harrison called Westfall and told him that he had spoken to Kremers and that Kremers had asked Harrison to contact Westfall. Harrison explained to Westfall that he was interested in Pacific Mutual's underwriting support for a group dental insurance program for North Carolina state employees.[14] After hearing Harrison's proposal, Westfall initially said that Pacific Mutual would not be interested in such a program because the company could not do separate billings for a large number of people.[15] Harrison told Westfall he would take care of the billings, and Westfall indicated that Pacific Mutual would—under those conditions—be interested in the proposed program.[16] Westfall referred Harrison to Kathy Carlson ("Carlson"), Pacific Mutual's Regional Manager for North Carolina, South Carolina, Georgia, and Alabama.[17] After speaking with Westfall, Harrison spoke to Kremers again, and Kremers told Harrison to deal with Carlson from that point onward.[18]

Harrison contacted Carlson. As a result of Harrison's and Carlson's discussions and correspondence, a group dental insurance program that was acceptable to SEANC was developed to be offered on a voluntary basis to SEANC's 48,000 state governmen-

independent agents trained by him. An "overwrite" is an percentage of each premium dollar written by an independent agent on behalf of a particular insurance carrier, which is paid by the carrier to the general agent as a fee for soliciting and training the independent agent.

6. Carlson Depo. Exh. 106 (letter from North Carolina Department of Insurance).

7. Carlson Depo. at I–66.

8. Harrison Depo. at I–138.

9. Harrison Depo. at I–162 to 164. Harrison was negotiating with the State Employees Association of North Carolina ("SEANC")—which represents about 48,000 employees—about the den-

tal insurance program, and SEANC insisted upon an A plus rated insurance company. *Id.*

10. *Id.* at I–175.

11. *Id.* at I–176 to 177.

12. *Id.* at I–176 to 179, I–196.

13. *Id.* at I–176 to 179, I–196 to 197.

14. *Id.* at I–180.

15. *Id.* at I–180.

16. *Id.* at I–180.

17. *Id.* at I–180.

18. *Id.* at I–181.

tal employees.[19] Carlson, apparently with Pacific Mutual's approval and authority, represented to Harrison that the program would be underwritten by Defendant if Harrison and his Agency could obtain participation in the program of fifty percent (50%) of all eligible employees.[20] In addition, Carlson represented to Harrison that employees enrolled in the dental program would pay one hundred percent (100%) of the premium and told Harrison that he was to receive a graded scale commission—beginning at 8.13 percent of premiums—for his and the Agency's solicitation efforts plus a two percent (2%) fee for administering the program.[21]

During the Fall of 1985, Harrison and the Agency proceeded to solicit employees for participation in the dental insurance program. SEANC, however, did not have a payroll deduction slot, and, therefore, it could not guarantee that all of its members would be part of the dental program. Since he could not proceed through SEANC, Harrison proceeded to solicit individual state agencies directly to gain approval from each agency's insurance committee. Harrison also began soliciting school systems, and county governments.[22]

These additional solicitation efforts increased the number of potential eligible employees, from SEANC's 48,000 to well over two hundred thousand governmental employees.[23]

Although the dental program Plaintiffs offered had only a fifty percent (50%) participation requirement, North Carolina statutory law at that time required seventy-five percent (75%) participation in all voluntary group health insurance plans.[24] In addition, Defendant has an underwriting policy which prohibits the underwriting of a group health insurance program with less than seventy-five percent (75%) participation.[25]

In March 1986, Harrison received a telephone call from an attorney with the North Carolina Insurance Department, Fran Di Pasquantonio ("Di Pasquantonio").[26] Di Pasquantonio was a member of the North Carolina Department of Insurance's employee insurance committee, which was evaluating the group dental insurance program offered by Plaintiffs. Di Pasquantonio told Harrison that the group dental insurance program Plaintiffs were offering did not meet the minimum participation re-

---

**19.** Harrison Depo. Exh. 1 (Employee Benefit Plan, dated July 30, 1985); Harrison Depo. at I–189 to 192.

**20.** Harrison Depo. Exh. 1 (explaining underwriting assumptions, including a fifty percent (50%) employee participation requirement); Harrison Depo. at II–3 to 10.

**21.** A graded scale commission works this way: A certain percentage, here 8.13%, is paid for a low amount of sales, but as sales increase beyond a minimal amount, the rate of commission drops to lower percentages on a graded scale basis.

**22.** Harrison Depo. at II–13 to 15 ("Not [SEANC] members because that had all changed. We were just calling on school systems, state agencies, and county governments.").

**23.** *Id.* at II–35 to 36.

**24.** The pertinent portions of Section 58–254.4(b) of the North Carolina General Statutes provided—before the Section was amended—the following:

No policy or contract of ... group health ... insurance shall be delivered or issued for delivery in this State unless the group of persons thereby insured conforms to the requirements of the following paragraphs: .... If the premium is paid by the employer and the employees jointly, or by the principal and the agents jointly, or by the principal and agents jointly, or by the employees, or by the agents, *the group shall comprise not less than seventy-five percent (75%) of all persons eligible of any class or classes of employees, or agents, determined by conditions pertaining to the employment or agency.*

N.C.Gen.Stat. § 58–254.4(b) (1982) (emphasis added) (amended August 8, 1987).

On August 8, 1987, the North Carolina General Assembly amended Section 58–254.4(b) by eliminating the last sentence of the quoted paragraph above and by adding the following language: "If the premium is paid by the employer and the employees jointly, or by the principal and the agents jointly, or by the employees, or by the agents, the group shall be structured on an actuarially sound basis." 1987 N.C.Sess. Laws, c. 752, § 19; N.C.Gen.Stat. § 58–254.4(b) (Cum.Supp.1988).

**25.** Depo. Exh. 86 (Pacific Mutual's Group Underwriting Manual); Lehman Depo. at 53.

**26.** Harrison Depo. at II–52–56.

quirements established in North Carolina's insurance laws.[27] After receiving Di Pasquantonio's call, Harrison telephoned Carlson.[28]

From the record before this Court now, it appears that Carlson deceived both Defendant and Plaintiffs.[29] She apparently did not tell her superiors that she had approved the group dental insurance program. She also apparently did not tell Plaintiffs that Defendant had not approved of the plan. Plaintiffs allege that Carlson represented to Plaintiffs that (1) Pacific Mutual had authorized the North Carolina state and local government employees to choose a dental plan from among several plans prepared for their consideration, (2) that Pacific Mutual had approved certain premium schedules for these plans, (3) that Pacific Mutual had agreed to underwrite the plan selected by those employees, (4) that Pacific Mutual had agreed to accept the plan with an employee participation percentage of approximately 30%, (5) that Pacific Mutual would pay Plaintiff Harrison's commissions on this plan based on an 8.13% monthly graded scale, (6) that Pacific Mutual was aware of the program, had approved all aspects of the program, and had agreed to provide Tony Harrison with a license to represent Pacific Mutual, and (7) that Pacific Mutual encouraged Plaintiff Harrison in his efforts to broaden the appeal of the plan and to enroll more groups and individuals. Plaintiffs also assert that Defendant knew Carlson had a propensity to make misrepresentations.

When Carlson did reveal to Plaintiffs that the program had not been approved by Defendant, Harrison flew to California to meet with Defendant's representatives. On March 27, 1986, Harrison explained the situation to Defendant's representatives, and the representatives, at that time, according to Defendant, learned for the first time that Plaintiffs were soliciting state and local governmental employee participation in a group dental insurance program that was represented as being underwritten by Defendant. The program, as designed, was objectionable to Defendant's representatives in California, and they sought to terminate the program. Defendant's representatives directed Plaintiffs to cease soliciting participants for the dental insurance program.

Defendant's representatives offered as reasons for the termination that (1) Carlson was acting without authority to commit the company to such a program, (2) that Defendant did not, as a matter of actuarial policy, underwrite group health programs with less than seventy-five percent (75%) employee participation, and (3) that Defendant's home office in California was completely unaware of any of Carlson's activities regarding the group dental insurance program.

Thereafter, Defendant's representatives met with officials in the Office of the Commissioner of Insurance of North Carolina to discuss Defendant's options. Defendant opted to issue individual franchise insurance policies to those employees who had joined the group dental insurance program, but Defendant also terminated the group dental program as designed by Plaintiffs.

Defendant asserts that it has suffered losses of over a half a million dollars ($500,-000.00) in its underwriting of the individual franchise policies, but it has continued to renew these franchise policies. Defendant has paid to Plaintiffs service fees and commissions for the policies solicited, but Plain-

---

**27.** Another problem with the group dental insurance program offered by Plaintiffs was that it had not been duly registered with the Department of Insurance. Pacific Mutual only had one dental policy registered in North Carolina, but that policy was part of a life, health, and disability policy—GR-84.

**28.** *Id.* According to Harrison, when he told Carlson he was going to call Pacific Mutual's Home Office to straighten out the apparent problems with the group dental insurance program's participation requirements Carlson said,

"Oh, shit! Don't call the home office." *Id.* at II–53. Carlson also said, "I guess you are aware that I've been fudging with the home office." *Id.* at II–53 to 54.

**29.** This Court, however, will not attempt to resolve here any material factual disputes as to what the parties knew and when they knew it. These issues will be relevant for determining Plaintiffs' remaining claims of fraud, negligent supervision, and unfair trade practices.

tiff Harrison contends that the amounts of such payment are less than the amounts Carlson allegedly promised him.

Defendant has terminated Carlson's employment.

## IV. QUESTIONS PRESENTED

(a) Should this Court grant summary judgment in favor of Defendant because Plaintiffs' breach of contract claims are premised upon the enforcement of a purportedly illegal agreement?

(b) Should this Court grant summary judgment in favor of Defendant because there was no meeting of the minds and, therefore, no enforceable contract between Carlson and Plaintiffs?

(c) Should this Court grant summary judgment in favor of Defendant because Plaintiffs' alleged contract with Pacific Mutual is too vague and indefinite for enforcement?

(d) Should this Court grant summary judgment in favor of Defendant because Pacific Mutual did not breach any purported contract with Plaintiffs?

(e) Should this Court grant summary judgment in favor of Defendant because North Carolina does not recognize the doctrine of promissory estoppel to create a contractual relationship?

(f) Should this Court grant summary judgment in favor of Defendant because Plaintiffs have purportedly failed to present evidence on the essential elements of a claim for tortious interference with contractual relations?

(g) Should this Court grant summary judgment in favor of Defendant because there is purportedly no basis for Plaintiffs' claims of fraud?

(h) Should this Court grant summary judgment in favor of Defendant because Plaintiffs' have purportedly failed to proffer evidence of Pacific Mutual's negligent supervision of Carlson?

(i) Should this Court grant summary judgment in favor of Defendant because Pacific Mutual's dealings with Plaintiffs are purportedly not governed by North Carolina's Unfair and Deceptive Trade Practices Act?

(j) Should this Court grant summary judgment in favor of Defendant because Pacific Mutual's conduct was not an unfair or deceptive trade practice?

## V. STANDARD OF DECISION

Rule 56(c) of the Federal Rules of Civil Procedure establishes the standard of decision this Court must use when determining Defendant's Motion for Summary Judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

Recently, the United States Supreme Court has had several occasions to construe the summary judgment standard established in Rule 56. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (antitrust conspiracy case); *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (libel action); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (asbestos related wrongful death action); *Adickes v. S.H. Kress Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1969) (alleged conspiracy to violate civil rights). These cases provide substantial guidance to this Court in its determination of Defendant's Motion for Summary Judgment.

In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court noted:

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with "specific facts showing that there is a *genuine issue for*

*trial."* Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

*Id.* 106 S.Ct. at 1356 (emphasis in original; footnote and citations omitted; quoting Fed.R.Civ.P. 56).

In the present case, Defendant has the burden of production to show that there are no genuine issues for trial. If that burden of production has been met, then the burden of persuasion shifts to Plaintiffs to establish that there are indeed genuine issues for trial.

In *Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court stated the following:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Id.* 106 S.Ct. at 2552–53; *accord White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 101 (4th Cir.1987).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; Rule 56 requires that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]he substantive law will identify which facts are material." *Id.*

Finally, it is worth noting that in *Anderson v. Liberty Lobby, Inc.* the Court held:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted.

*Id.* 106 S.Ct. at 2511. On the other hand, all favorable inferences from the pleadings and depositions are to be drawn in favor of the party opposing the motion for summary judgment. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *White,* 820 F.2d at 101.

## VI. DISCUSSION

### A. *Enforcement of an Illegal Agreement*

■ Defendant argues at length that Plaintiffs are seeking to enforce an illegal agreement, that illegal agreement being the group insurance plan which required less than a seventy-five percent (75%) participation rate. Plaintiffs have two principal arguments against this position. First, Plaintiffs assert that they are not seeking to enforce the group dental insurance agreement; Plaintiffs contend they are seeking to enforce an agency agreement whereby Defendant promised that certain commissions would be paid to Plaintiffs if they enrolled state and local employees in a dental plan, the form of which—whether a group plan or a franchise arrangement—did not particularly matter to Plaintiffs. Second, Plaintiffs assert that even if they were seeking to enforce the group dental plan, which had a participation rate below the statutorily required seventy-five percent (75%), North Carolina public policy does not prohibit the enforcement of that agreement under all circumstances.

This Court is of the opinion that Plaintiffs' claim for breach of contract must be dismissed because it is based upon a contract that was closely connected to a group dental insurance program that violated North Carolina's insurance laws. If this Court were to allow Plaintiffs to proceed on their breach of contract claim—and thereby allow Plaintiffs to pursue all the commissions they assert they are entitled to—it would be rewarding Plaintiffs for offering to the North Carolina public a group dental insurance program that the North Carolina General Assembly had de-

termined at that time to be against the best interests of the public.

■ Plaintiffs' breach of contract claim is closely connected to the illegal group insurance plan, and this Court will grant summary judgment to Defendant on this claim and dismiss it because there are no genuine issues of material fact. *Lamm v. Crumpler*, 242 N.C. 438, 88 S.E.2d 83 (1955); *Florsheim Shoe Co. v. Leader Department Store, Inc.*, 212 N.C. 75, 193 S.E. 9 (1937). North Carolina courts "will not lend their aid to the enforcement of a contract when [it] violates the positive legislation of the state." *Florsheim Shoe Co.*, 212 N.C. at 77–78, 193 S.E. at 10. If a party's recovery is premised upon proving the existence of an illegal contract or transaction, there is no entitlement to any recovery. *Id.; see also Standard Fashion Co. v. Grant*, 165 N.C. 453, 81 S.E. 606 (1914). "No principle of law is better settled than that a party to an illegal contract cannot come into a court of law, and ask to have his illegal objects carried out." *Lamm v. Crumpler*, 242 N.C. at 442, 88 S.E.2d at 86. Thus, " 'where a contract grows immediately out of and is connected with an illegal or immoral act, a court of justice will not lend its aid to enforce it. . . .' " *Id.*, 88 S.E.2d at 87 (quoting *Electrova Co. v. Spring Garden Ins. Co.*, 156 N.C. 232, 72 S.E. 306 (1911)). Simply stated, the courts of North Carolina "will not aid in the division of profits of an illegal transaction between associates." *Id.* 242 N.C. at 443, 88 S.E.2d at 87 (quoting 17 C.J.S. *Contracts* § 277).

In *Florsheim Shoe Co. v. Leader Department Store, Inc.*, 212 N.C. 75, 193 S.E. 9 (1955), the plaintiff brought an action to recover the purchase price of shoes sold to the defendant on account. The defendant in *Florsheim Shoe* counterclaimed alleging that the plaintiff had violated their exclusive agency relationship by selling shoes to a competitor. North Carolina law, however, prohibited exclusive dealings that inhibit competition. At the trial in *Florsheim Shoe* the defendant's evidence showed that it had agreed with the plaintiff not to carry shoes manufactured by a competitor of the plaintiff in exchange for the right to be the plaintiff's exclusive agent. The North Carolina Supreme Court held that this testimony proved a violation of the North Carolina statute which prohibited anti-competitive exclusive agency agreements. As a result, the contract was unenforceable, and the defendant's counterclaim was dismissed.

Plaintiffs' breach of contract claim arises from, and depends upon, the underlying illegal group dental insurance program. At the time Plaintiffs were offering the group dental insurance program to North Carolina's state and local governmental employees, Section 58–254.4(b) of the North Carolina General Statutes prohibited the delivery or the issuance for delivery of any group health insurance contract or policy that (1) required the employees to pay the premium *and* (2) required less than seventy-five percent (75%) of all eligible employees to participate. N.C.Gen.Stat. § 58–254.4(b) (1982) (amended August 7, 1987). The group dental insurance program Plaintiffs offered undisputedly required only fifty percent (50%) participation, and, therefore, the program as designed and offered to North Carolina's citizens violated North Carolina's insurance laws. Thus, as in *Florsheim Shoe*, this Court will dismiss Plaintiffs' breach of contract claim, which arises directly from Plaintiffs' offering of a clearly illegal group dental insurance policy.

The North Carolina courts have not yet considered whether an insurance agent, broker, or promoter can recover for lost profits allegedly caused by the failure of an insurance company to underwrite an illegal group insurance policy, but in *Stainback v. Investor's Consolidated Insurance Co.*, 64 N.C.App. 197, 306 S.E.2d 532 (1983), the North Carolina Court of Appeals reviewed a case involving Section 58–254.4(b)'s seventy-five percent employee participation requirement. *Stainback* is distinguishable from the factual and legal issues before this Court. In *Stainback*, the defendant issued a group health insurance policy to the plaintiff, who was the president of a small company that had only two employees—himself and another person. At the time the policy was issued, plaintiff

informed the defendant that the other employee would be resigning soon. Th defendant issued the policy, and six months later plaintiff's minor son was severely injured and hospitalized. The plaintiff filed a claim, but the defendant refused payment because the second employee had not resigned and plaintiff was the only employee participating in the plan—resulting in fifty percent participation. The North Carolina Court of Appeals held that the defendant was required to honor the policy because Section 58–258(b) provides as follows:

> A policy delivered or issued for delivery to any person in this State in violation of this Subchapter shall be held valid but shall be construed as provided in this Subchapter. When any provision in a policy subject to this Subchapter is in conflict with any provision of this Subchapter, the rights, duties and obligations of the insurer, the insured and the beneficiary shall be governed by the provisions of this Subchapter.

N.C.Gen.Stat. 58–258(b) (1982). In *Stainback*, the policy was delivered, and, therefore, the North Carolina Court of Appeals held that Section 58–258(b) required the defendant to honor the policy because it had failed to take timely affirmative action to cancel the policy before the plaintiff filed his claim. *Stainback*, 64 N.C.App. at 198–199, 306 S.E.2d at 534.

The holding of *Stainback* does not apply to the facts of the present case. The court of appeals in *Stainback* relied exclusively on Section 58–258(b), but that section refers to enforcing the rights between the insured, the insurer, and the beneficiary and was intended to protect the insured and beneficiary. Section 58–254.4(b) does not mention insurance agents, brokers, or

promoters, and the language of the section indicates that the North Carolina General Assembly was not concerned with protecting the pecuniary interests of brokers, agents, or promoters.[30] The decision in *Stainback* protects the interests of the innocent insureds, and it cannot be used by Plaintiffs to obtain profits.

Plaintiffs rely heavily upon *Marriott Financial Services, Inc. v. Capitol Funds, Inc.*, 288 N.C. 122, 217 S.E.2d 551 (1975), which Plaintiffs characterize as the "key North Carolina case on the law of 'illegal' contracts." This Court is of the opinion that *Marriott Financial Services* supports this Court's holding in this case. The North Carolina General Assembly intended to protect North Carolina's citizens by enacting Section 58–254.4(b)'s seventy-five percent participation requirement; such a requirement, in the judgment of the North Carolina legislature, provided some assurance that the program would be actuarially sound. The North Carolina General Assembly surely did not intend that agents offering presumptively unsound group health insurance programs—those with less than seventy-five percent participation—should be rewarded by receiving commissions on such programs. If the group dental insurance program had actually been issued in North Carolina, Plaintiffs would have been criminally liable. An alert attorney at the Department of Insurance saved Plaintiffs from their own folly, and the group dental insurance program was never issued. Instead, Pacific Mutual has issued legitimate individual franchise policies to all of those people Plaintiffs solicited, and Plaintiffs receive commissions and servicing fees on those franchise policies. This Court simply cannot believe that the North Carolina legislature intended that Plaintiffs

---

**30.** Indeed, at the time Plaintiffs offered the group dental insurance plan Section 58–262 of the North Carolina General Statutes provided as follows:

> Any company, association, society, or other insurer or any officer or agent thereof, which or who issues or delivers to any person in this State any policy in willful violation of this Subchapter, shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not more than five thousand dollars ($5000.00) for each offense, and the Commis-

sioner of Insurance may revoke the license of any company, corporation, association, society, or other insurer of another state or country, or of the agent thereof, which or who willfully violates any provision of this Subchapter.

N.C.Gen.Stat. § 58–262 (Cum.Supp.1988). This statute indicates to the undesigned that the North Carolina General Assembly intended to deter violations of Section 58–254.4(b), not reward the violators by giving them commissions for selling and delivering illegal policies.

should be compensated for something that they should not have been doing in the first place.

This Court's resolution of this issue makes it unnecessary to consider Defendant's other arguments (no meeting of the minds, vagueness, and lack of breach) relating to Plaintiffs' breach of contract claim. Therefore, questions (b), (c), and (d) will not be addressed.

### B. *Promissory Estoppel*

Plaintiffs have abandoned this theory of recovery, and, therefore, dismissal of this claim for relief is appropriate.

### C. *Elements of Claim for Tortious Interference with Contractual Relations*

Plaintiffs have also abandoned this theory of recovery, and this Court will also dismiss this claim for relief.

### D. *Fraud*

■ This Court has carefully considered the parties' arguments regarding Plaintiffs' claims of fraud and is of the opinion that there are genuine issues of material fact which preclude the entry of summary judgment. After all the evidence has been presented at trial, it may appear that a directed verdict is appropriate, but for now summary judgment is inappropriate.

### E. *Negligent Supervision*

■ Defendant argues that Plaintiffs have failed to produce sufficient evidence to raise a genuine issue on the elements of negligent supervision, which are:

1) A standard of care owed by a reasonably prudent person in similar circumstances;
2) A breach of that standard of care;
3) An injury caused directly or proximately by the breach; and
4) A loss as a result of the injury.

Defendant argues that even if Carlson was negligently supervised by Defendant Plaintiffs have not been harmed directly or proximately by such negligent supervision because they are in the same position now as they would have been had Carlson been properly supervised; Plaintiffs never achieved 75% or even 50% enrollment. Defendant also asserts that Plaintiffs were contributorily negligent for not being aware of the state laws regarding insurance underwriting.

Plaintiffs note that Defendant does not seriously contend it did not negligently supervise Carlson, but instead seeks to defend against Plaintiffs' claims by asserting that Plaintiffs have not been proximately harmed by the negligent supervision. Plaintiffs argue that the harms they have suffered were the reasonably foreseeable result of Defendant's failure to supervise Carlson properly. Plaintiffs also point out that Carlson had an alleged history of being a "loose cannon" and that Defendant should have realized that she could possibly harm any innocent souls she came in contact with. Plaintiffs argue that they were proximately harmed by Defendant's negligent supervision because the injuries suffered by Plaintiffs were not inevitable. Finally, Plaintiffs note that the issue of contributory negligence is one of fact that should be left for the jury.

Again, this Court is of the opinion that it would be inappropriate to enter summary judgment against Plaintiffs on this claim.

### F. *North Carolina's Unfair and Deceptive Trade Practices Act*

Defendant argues that North Carolina's Unfair and Deceptive Trade Practices Act applies only to injuries felt by consumers not injuries felt by other businesses. Plaintiffs argue that the scope of the Act does embrace the present situation. This Court is of the opinion that it would be inappropriate to enter summary judgment on this claim at this time.

### VII. CONCLUSIONS

NOW, THEREFORE, IT IS ORDERED that Defendant's Motion for Summary Judgment, filed January 27, 1988, is DENIED IN PART and GRANTED IN PART.

IT IS FURTHER ORDERED that Plaintiffs' Second, Third, and Fourth Claims for

Relief are DISMISSED UPON THE MERITS.