Tumlin v. Tuggle Duggins P.A., 2018 NCBC 129.

STATE OF NORTH CAROLINA

COUNTY OF GUILFORD

WAYNE E. TUMLIN,

        Plaintiff,

    v.

TUGGLE DUGGINS P.A.,

        Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 9887

**ORDER & OPINION
ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

1.    THIS MATTER is before the Court on Defendant Tuggle Duggins P.A.'s Motion for Summary Judgment (the "Motion"). For the reasons stated below, the Motion is GRANTED in part, DENIED in part, and DEFERRED in part.

*Nelson Mullins Riley & Scarborough LLP, by G. Gray Wilson and Lorin J. Lapidus, for Plaintiff Wayne E. Tumlin.*

*Sharpless McClearn Lester Duffy, PA, by Frederick K. Sharpless, for Defendant Tuggle Duggins, P.A.*

Gale, Judge.

## I.   INTRODUCTION

2.    This dispute concerns an attorney, his former law firm, and their disagreement as to whether the attorney is entitled to post-termination compensation after voluntarily resigning without adequate notice. Plaintiff, Wayne E. Tumlin ("Tumlin"), worked for Defendant Tuggle Duggins P.A. ("Tuggle Duggins" or the "Firm"), from May 2008 until he resigned effective June 5, 2015, having provided a letter of resignation to the President of the Firm at the time, Mr. Ross Hamilton

("Hamilton"), and the Firm Administrator, Ms. Elizabeth Osteen ("Osteen") on May 19, 2015.

3. Tumlin contends that he is entitled to post-termination compensation on either of two grounds. His Complaint asserts this right based solely on the offer upon which he accepted employment with the Firm (the "Offer Letter"). He subsequently claims in the alternative that he is entitled to such compensation under the Firm's policy that purportedly controls post-termination compensation rights for all departing attorneys (the "Firm Policy").

4. Tuggle Duggins contends that Tumlin is not entitled to compensation on either basis. As to the Offer Letter, Tuggle Duggins contends that its terms provide no grounds for such compensation. As to the Firm Policy, while admitting that it might otherwise provide Tumlin with a right to post-termination compensation, the Firm posits that such compensation is conditioned on providing 30 days' written notice of resignation (the "Notice Requirement"), which Tumlin failed to provide. Tumlin responds that the Notice Requirement does not bar his claim, either because the Firm waived that condition precedent, or because the Notice Requirement contravenes public policy.

5. Tumlin also contends that the compensation he is due constitutes wages under the North Carolina Wage and Hour Act. Finally, Tumlin presents an alternative claim based on unjust enrichment.

6. For reasons discussed below, the Court concludes that Tumlin's breach of contract claim fails to the extent it is based on the Offer Letter, that the Notice

Requirement in the Firm Policy does not contravene public policy, and that there are contested material issues as to whether the Firm waived the Notice Requirement that should be addressed by a jury. The North Carolina Wage and Hour Act and unjust enrichment claims cannot be resolved until the contested notice issue is resolved.

## II. PROCEDURAL BACKGROUND

7. Tumlin began this action by filing his Complaint in Guilford County Superior Court on November 30, 2015, asserting claims for breach of contract, unjust enrichment, violation of the North Carolina Wage and Hour Act, fraud, and a request that the Court declare that the Notice Requirement in the Firm Policy is void as a matter of public policy. (Compl., ECF No. 1.)

8. Tuggle Duggins filed a Notice of Designation requesting that the case be designated as a mandatory complex business case on December 29, 2015. (Notice Designation Action Mandatory Complex Business Case N.C. Gen. Stat. § 7A-45.4(a)(1), ECF No. 5.) The Chief Justice designated the case as a mandatory complex business case on January 4, 2016, (Designation Order, ECF No. 6), and it was assigned to the undersigned on January 5, 2016, (Assignment Order, ECF No. 7).

9. Tuggle Duggins timely answered the Complaint, (Answer & Mots. Dismiss, ECF No. 10), after which on September 26, 2016, with leave of Court, Tuggle Duggins amended its Answer to include an affirmative defense of good faith to Tumlin's North Carolina Wage and Hour Act claim, (Am. Answer, ECF No. 33).

10. Tuggle Duggins filed the Motion on all of Tumlin's claims on January 25, 2018. (Def.'s Mot. Summ. J., ECF No. 57.) Tumlin voluntarily dismissed his claim

for fraud without prejudice on August 31, 2018. (Pl.'s Partial Voluntary Dismissal Without Prejudice, ECF No. 71.)

11. Discovery has closed, the Motion was fully briefed, and the Court heard oral argument on September 4, 2018. The Motion is now ripe for disposition.

### III.    FACTUAL BACKGROUND

12. The Court makes no findings of fact on a motion for summary judgment but summarizes the following undisputed and contested facts to provide context for its ruling. *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 165 (1975).

#### A.    The Parties

13. Tumlin is a citizen and resident of Greensboro, Guilford County, North Carolina. (Compl. ¶ 1; Am. Answer ¶ 1.) Tuggle Duggins is a North Carolina professional association with its principal place of business in Greensboro, Guilford County, North Carolina. (Compl. ¶ 2; Am. Answer ¶ 2.)

#### B.    Tumlin's Employment

14. In early 2008, Tuggle Duggins extended Tumlin an offer which he accepted. In May 2008, Tumlin moved to North Carolina from Maine and began working at Tuggle Duggins on mergers and acquisitions, corporate law, securities, and corporate finance. (Compl. ¶¶ 3–4; Am. Answer ¶ 4.)

15. Robert Cone ("Cone"), a Tuggle Duggins partner at the time, prepared a memorandum addressed to the Firm's directors summarizing the reasons why an offer to Tumlin was being considered, and the terms on which an offer might be

extended to him. The record does not contain a formal employment contract signed by Tumlin. Rather, it appears that Tumlin was provided a copy of the memorandum Cone prepared for his fellow directors and accepted the terms outlined therein. The Court refers to Cone's memorandum as the previously defined Offer Letter.

16. The Offer Letter specified a short-term guaranteed salary, and contemplated that Tumlin would buy stock in Tuggle Duggins for $55,000 within sixty days of passing the North Carolina Bar Exam. (Br. Supp. Def.'s Mot. Summ. J. 5 ("Def.'s Summ. J. Br."), ECF No. 58.) In September 2009, Tumlin purchased that stock and became a shareholder. At varying times during his employment, Tumlin was an employee, a shareholder, an officer, and a director of the Firm. (Dep. Wayne E. Tumlin 32:24–35:5 ("Tumlin Dep."), ECF No. 59.1.) Tumlin was also a member of the Firm's executive committee from 2012 until May 2015 (Tumlin Dep. 43:10–16), in which role he oversaw the voluntary resignation of at least one shareholder, (Tumlin Dep. 36:20–25). At the time that Tumlin purchased stock in the Firm, Tumlin signed a Stock Purchase Agreement amended by a Building and Lease Agreement. (Compl. ¶ 6; Am. Answer ¶ 6.) Neither of these documents refer to nor incorporate the Firm Policy.

### C.   Tumlin's Offer Letter and the Firm Policy

17. In claiming a right to post-termination compensation based on the Offer Letter, Tumlin relies on one of its sentences, which states in pertinent part: "[i]f Wayne resigns from Tuggle Duggins before August 30, 2011[,] his compensation will end and he will not be entitled to: any bonuses after his date of departure; collection

of any trailing accounts receivable; or any guaranteed amounts that would otherwise come due after his departure." (Aff. Wayne E. Tumlin Ex. A, at ¶ IV.D ("Offer Letter"), ECF No. 68.2.) Tumlin argues that the last clause is a reference to paragraph IV.C in the Offer Letter, which states: "[a]gain, Wayne could take the maximum draw, be eligible for quarterly bonuses based on production, and any guaranteed amounts would be paid by the end of the year." (Offer Letter ¶ IV.C.)

18. The Firm Policy was also in place when Tumlin was hired, but the Offer Letter does not explicitly refer to it. Tumlin claims a right to post-termination compensation based on the Firm Policy alone. It provides,

> Shareholders/Directors. Upon termination of employment due to death, disability, *voluntary separation (subject to provisions of paragraph 6)*, or involuntary separation *a Shareholder/Director attorney shall be entitled to compensation based upon production credits allocated to that Shareholder/Director attorney in the Firm's books on collections made by the firm* (i) through the end of the Firm's fiscal year in which termination of employment occurs, and (ii) through the end of the Firm's fiscal year next following the fiscal year in which termination of employment occurs.

(Tumlin Dep. Ex. 11, at ¶ 4 ("Firm Policy"), ECF No. 59.1 (emphasis added).) Paragraph six of the Firm Policy conditions the right to post-termination compensation:

> Notice. In the event that a Shareholder/Director desires to terminate his or her employment with the Firm by voluntary separation, written notice shall be given to each the President and Secretary of the Firm. The written notice required by this Paragraph shall be given a minimum of thirty (30) days in advance of the effective date of termination of employment by voluntary separation. *The giving of written notice required by this Paragraph 6 is a condition precedent to the payment of all compensation to a Shareholder/Director under Paragraph 4.*

(Firm Policy ¶ 6 (emphasis added).)

19.     The Firm maintains that the Firm Policy was put in place in the late 1980s to prevent "a departure from the firm on a kind of overnight basis and . . . to provide a 30 day transition period where . . . both sides could have an opportunity to talk to . . . clients and work it out." (Dep. Ross Hamilton 77:21–78:2 ("Hamilton Dep."), ECF No. 59.2.)

20.     The Firm Policy was revised in December 2008 after Tumlin became a director in order to comply with Internal Revenue Code section 409A. (*See* Tumlin Dep. Ex. 10, at 2 ("Ex. 10"), ECF No. 59.1.) On December 16, 2008, all directors of the Firm, including Tumlin, were e-mailed a red-lined version of the updated Firm Policy. (*See* Ex. 10.) Neither the entitlement to post-termination compensation for shareholders and directors in paragraph four, nor the Notice Requirement stated in paragraph six were modified in 2008. (*See* Ex. 10, at 2.) The Court refers to the Firm Policy as amended in 2008.

D.     **Tumlin's Resignation**

21.     On May 19, 2015, Tumlin e-mailed Hamilton and Osteen his letter of resignation ("Resignation Letter") stating that his last day would be June 5, 2015. (*See* Compl. ¶ 18; Am. Answer ¶ 18.) Prior to submitting his Resignation Letter, Tumlin met with Hamilton on May 14, 2015 to discuss his leaving ("May 14 Meeting"). (*See* Compl. ¶ 13 (stating the two met "[o]n or about May 13"); Am. Answer ¶ 13 (stating the two met on May 14).) During the May 14 Meeting, Hamilton requested that Tumlin reconsider resigning. (*See* Compl. ¶ 16; Am. Answer ¶ 16.)

On May 18, Tumlin and Hamilton met again, and Hamilton asked Tumlin to consider staying another year ("May 18 Meeting"). (Compl. ¶ 17; Am. Answer ¶ 17.)

22. Tumlin states that he had not finalized his Resignation Letter prior to the May 18 Meeting because he wanted to discuss a mutually agreeable departure date. Tumlin claims that, during the May 18 Meeting, Hamilton agreed to the June 5 departure date, and it was this agreement that assured Tumlin that June 5 was an acceptable date for the Firm. (Compl. ¶ 37; *see* Tumlin Dep. 57:22–58:6.) However, Tuggle Duggins denies that Hamilton accepted the June 5 departure date in any way prior to receiving Tumlin's Resignation Letter on May 19. (Hamilton Dep. 45:21–23, 56:6–8.)

23. Following his departure Tumlin continued to work with the Firm on client transition matters. (Compl. ¶ 22; Am. Answer ¶ 22.) On September 19, 2015, Tumlin sent Hamilton an e-mail inquiring about when he would receive his "payment for collected fees allocated to [him] for work performed" during the months he was employed in that fiscal year. (Compl. ¶ 31; *see* Am. Answer ¶ 31.) Hamilton responded by e-mail that Tuggle Duggins owed Tumlin no further compensation and attached the Firm Policy. (Compl. ¶ 32; Am. Answer ¶ 32.)

## IV. STANDARD OF REVIEW

24. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact[,] and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c). "Summary

judgment is improper if any material fact is subject to dispute." *Culler v. Hamlett*, 148 N.C. App. 389, 391, 559 S.E.2d 192, 194 (2002). The movant bears the burden of proving the lack of a triable issue. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). Once the movant has met that burden, the burden shifts to the nonmoving party to produce a forecast of evidence that demonstrates facts showing that it can establish a prima facie case at trial. *Austin Maint. & Constr., Inc. v. Crowder Constr. Co.*, 224 N.C. App. 401, 407, 742 S.E.2d 535, 540 (2012). The Court must view all the presented evidence in the light most favorable to the nonmoving party. *Dalton*, 353 N.C. at 651, 548 S.E.2d at 707.

## V.     ANALYSIS

### A.     Tumlin's rights under the Offer Letter and Firm Policy

25.     Tumlin premises his breach of contract claim on both the Offer Letter and the Firm Policy independently. (*See* Br. Opp'n Def.'s Mot. Summ. J. 8–11 ("Br. Opp'n Summ. J."), ECF No. 68.) Even though Tumlin did not state a claim based on the Firm Policy in his Complaint, the Firm has on several occasions conceded that Tumlin would have had a right to post-termination compensation under the Firm Policy in some amount if he had satisfied the Notice Requirement as a condition precedent. The record does not, however, include any basis upon which Tumlin is able to enforce and be bound by the Firm Policy, for example by virtue of his status as an employee, shareholder or director. The Court is permitted, in its discretion, to consider claims beyond those expressly stated in the pleadings when ruling on a motion for summary judgment. *See Stephenson v. Warren*, 136 N.C. App. 768, 771,

525 S.E.2d 809, 811 (2000); *see also Sitelink Software, LLC v. Red Nova Labs, Inc.*, No. 14 CVS 9922, 2018 NCBC LEXIS 90, at *15 (N.C. Super. Ct. Aug. 20, 2018). Therefore, the Court, in its discretion, will consider Tumlin's claim to post-termination compensation under the Firm Policy as well as the Offer Letter, while recognizing the need for further development of the record to determine if there is a right under the Firm Policy to be enforced, and if so, in what amount.

26.    The elements of a breach of contract claim are the existence of a valid contract and a material breach of its terms.  *Samost v. Duke Univ.*, 226 N.C. App. 514, 518, 742 S.E.2d 257, 260 (2013) (citing *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000)).  At common law, a material breach gives the non-breaching party the right to sue at law for damages, or in equity for rescission if the legal remedy is inadequate.  *See Hardin v. KCS Int'l*, 199 N.C. App. 687, 705, 682 S.E.2d 726, 739 (2009).  A breach is material if it goes to "the very heart of the instrument" and the breached provision "is such an essential part of the bargain that the failure of it must be considered as destroying the entire contract."  *Wilson v. Wilson*, 261 N.C. 40, 43, 134 S.E.2d 240, 242–43 (1964) (quoting *Steak House, Inc. v. Barnett*, 65 So. 2d 736, 738 (Fla. 1953)).

### (1)    **The Offer Letter contains no promise of post-termination compensation independent from the Firm Policy**

27.    Tumlin argues that, at a minimum the Offer Letter is ambiguous with respect to Tumlin's entitlement to post-termination compensation, precluding summary judgment because the interpretation of an ambiguous contract is a matter for a jury.  (*See* Br. Opp'n Summ. J. 10.)  Tuggle Duggins contends the Offer Letter

cannot be interpreted so as to provide specific enough terms from which to raise even an ambiguity as to whether it includes a promise of post-termination compensation. (*See* Def.'s Reply Pl.'s Resp. Def.'s Mot. Summ. J. 3, ECF No. 69.)

28.     The law distinguishes between ambiguous contracts and contracts which are invalid as a matter of law for failure to specify a material term.  *See Gunn v. Lab. Corp. of Am.*, No. 13 CVS 1599, 2014 NCBC LEXIS 29, at *14–15 (N.C. Super. Ct. July 3, 2014) (finding that a lessee was entitled to summary judgment on a broker's breach of contract claim because there was neither a definite term regarding the amount of the broker's commission, nor a method for calculating it).  A contract is ambiguous if "there is any uncertainty as to what the agreement is between the parties," *Crider v. Jones Island Club, Inc.*, 147 N.C. App. 262, 267, 554 S.E.2d 863, 867 (2001), and the "language of [the] contract is fairly and reasonably susceptible to either of the constructions asserted by the parties."  *Barrett Kays & Assocs., P.A. v. Colonial Bldg. Co.*, 129 N.C. App. 525, 528, 500 S.E.2d 108, 111 (1998) (quoting *Bicket v. McLean Sec., Inc.*, 125 N.C. App. 548, 553, 478 S.E.2d 518, 521 (1996)).

29.     The interpretation of an ambiguous contract is a question of fact based on intrinsic evidence, *see Crider*, 147 N.C. App. at 266–67, 554 S.E.2d at 866, while the construction of an unambiguous contract is a matter of law for the court, *see Bank of Am., N.A. v. Rice*, 230 N.C. App. 450, 456, 750 S.E.2d 205, 209 (2013) (quoting *Stovall v. Stovall*, 205 N.C. App. 405, 410, 698 S.E.2d 680, 684 (2010)).  But, if there is ambiguity, it must arise from the terms the parties included because, in construing a contract, a court may not "reject what the parties inserted or insert what the parties

elected to omit." *Weyerhaeuser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 719, 127 S.E.2d 539, 541 (1962).

30. Service contracts, such as the Offer Letter here, are unenforceable unless they contain a price or compensation term, or a method for determining that term. *See Brawley v. Brawley*, 87 N.C. App. 545, 550, 361 S.E.2d 759, 762 (1987) (citing *Howell v. Allen & Co.*, 8 N.C. App. 287, 289, 174 S.E.2d 55, 56 (1970)). A contract may be sufficiently definite if the language used explicitly references an external method for calculating price. *Id.* at 550, 361 S.E.2d at 762 (finding the contract definite where it stated "[c]osts shall be determined in accordance with CBI's accounting system and as set forth in Exhibit A attached hereto") (original emphasis omitted). But, critically, the Offer Letter neither speaks to how post-termination compensation would be calculated nor to the duration and time of the payment.

31. The Offer Letter language states only that if Tumlin resigns "before August 30, 2011, his compensation will end and he will not be entitled to: any bonuses after his date of departure; collection of any trailing accounts receivable; or any guaranteed amounts that would otherwise come due after his departure." (Offer Letter ¶ IV.D.) Tumlin argues that an ambiguity arises, because taking that language in the inverse, he cannot forfeit something to which he is not first entitled. (*See* Br. Opp'n Summ. J. 11.) He then argues that because he did not resign before August 30, 2011, he is entitled to bonuses, trailing accounts, and "any guaranteed amounts" that would "otherwise come due after his departure." However, the Offer Letter specifies neither under which circumstances those entitlements might

otherwise come due or be affirmatively triggered, nor the amounts that might be owed as a result. That omission is fatal.

32. Tumlin further argues that, read together, paragraphs IV.D and IV.C establish Tumlin's right to post-termination compensation. However, even read in tandem, paragraphs IV.D and IV.C do not describe an enforceable right to post-termination compensation, either explicitly or implicitly. While the Offer Letter states that any "guaranteed amounts" would be paid by the end of the year, the phrase "guaranteed amounts" is never defined to include post-termination compensation. Additionally, while the Offer Letter states generally that Tuggle Duggins is "a strict 'formula compensation' firm," (Offer Letter § II), there is no method provided for calculating compensation, let alone post-termination compensation in the Offer Letter itself, nor is there any reference to any external source containing such a formula.

33. While the Offer Letter may at best be read to refer to the Firm Policy, the significant point is that the Offer Letter itself cannot be an independent source of post-termination compensation. Accordingly, Tumlin's breach of contract claim is dismissed to the extent it is predicated on the Offer Letter. Even so, the issue of whether the condition precedent in the Firm Policy has been satisfied or waived is presented.

**(2)** **There are genuine issues of material fact regarding the enforceability of the Firm Policy and waiver of its Notice Requirement**

34.     Tumlin argues that if his breach of contract claim based solely on the Offer Letter fails, he is nevertheless entitled to post-termination compensation under the Firm Policy.  As noted above, the Firm Policy includes the Notice Requirement—an express 30 days' advance written notice provision that must be delivered to the Firm before termination of employment.  The survival of Tumlin's breach of contract claim then depends on whether Tumlin either satisfied the Notice Requirement, or the Firm waived that requirement.  Tumlin asserts that Hamilton accepted the June 5 departure date and waived the Notice Requirement by doing so.  (*See* Br. Opp'n Summ. J. 15.)

### a.     The enforceability of the Notice Requirement

35.     The Firm has acknowledged that Tumlin would have been entitled to post-termination compensation had he satisfied the Notice Requirement.  It follows that Tumlin's claim based on the Firm Policy is adequate to survive summary judgment if there are contested material facts as to whether the Notice Requirement was satisfied or waived.

36.     At this juncture, the Court accepts the Firm's concession that Tumlin has a right under the Firm Policy.  Without that concession, Tumlin has not developed a full record to support his assertion.  North Carolina courts have held that "[s]tipulations as to questions of law are generally held invalid and ineffective, and not binding upon the courts, either trial or appellate. . . ." *State v. Hanton*, 175 N.C. App. 250, 253, 623 S.E.2d 600, 603 (2006) (quoting *State v. Prevette*, 39 N.C. App. 470, 472, 250 S.E.2d 682, 683 (1979)); *see also Morton Bldgs., Inc. v. Tolson*, 172 N.C. App.

119, 125, 615 S.E.2d 906, 911 (2005). "The construction and effect of a written instrument is a question of law." *Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289 (1917) (citation omitted).

37. The Firm Policy purports to dictate the post-termination compensation rights of "Associates," (Firm Policy ¶ 2), "Principals," (Firm Policy ¶ 3), and "Shareholder/Directors," (Firm Policy ¶ 4). Significantly, the Firm Policy itself does not memorialize the legal mechanism by which the Firm's Shareholders/Directors are bound to it. More critically, Tumlin has not presented evidence that he ever expressly agreed to be bound by the Firm Policy. In fact, he disclaimed knowledge of certain terms, including the Notice Requirement. (*See* Aff. Wayne E. Tumlin Opp'n Def.'s Mot. Summ. J. ¶ 6 ("Tumlin Aff."), ECF No. 68.2.) Even though the Firm admits that Tumlin has some right under the Firm Policy, it is not yet clear exactly how the Firm Policy applies to Tumlin, assuming all claims are not barred because of a failure to satisfy the Notice Requirement. Those evidentiary issues await trial.

### b. Implied waiver of the Notice Requirement

38. The Court then turns its attention to the Firm's contention that Tumlin forfeited whatever rights he may have otherwise had under the Firm Policy when he failed to satisfy the Notice Requirement as a condition precedent.[1] There is no dispute that the effective date of Tumlin's resignation was less than 30 days after his

---

[1] While Tumlin did provide written notice of his departure to Hamilton, the president of the Firm, it is unclear from the record who the secretary of the Firm is, and whether notice was provided to him or her as is required by the Firm Policy. (*See* Firm Policy ¶ 6.)

first written notice of his intent to resign. (*See* Tumlin Aff. Ex. B ("Tumlin Resignation E-mail & Letter"), ECF No. 68.2.)

39. Tumlin claims that Hamilton waived the Notice Requirement on behalf of the Firm by agreeing to the June 5 departure date during the May 18 Meeting, and by accepting the Resignation Letter tendered to him via e-mail on May 19. (*See* Br. Opp'n Summ. J. 15.) The Firm contends that the evidence does not support a waiver as Hamilton expressly denies having agreed to the June 5 departure date, (*see* Hamilton Dep. 45:21–23, 56:6–8), and because waiver requires more substantial evidence of the Firm's intent to relinquish its right to insist on the condition precedent.

40. As the Firm Policy expressly includes the Notice Requirement as a condition to post-termination compensation, and Tumlin admits that he did not satisfy the 30 days' advance written notice requirement, the burden of proof falls on Tumlin to prove that the Firm waived his obligation to do so. In deciding whether the Firm is entitled to summary judgment then, the question is whether Tumlin has presented a forecast of evidence sufficient to support a jury finding that the Firm waived the Notice Requirement.

41. The elements of waiver are "(1) the existence, at the time of the alleged waiver, of a right, advantage or benefit; (2) the knowledge, actual or constructive, of the existence thereof; and (3) an intention to relinquish such right, advantage or benefit." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, No. 14 CVS 17400, 2015 NCBC LEXIS 64, at *10 (N.C. Super. Ct. June 19, 2015) (quoting *Demeritt v. Springsteed,*

204 N.C. App. 325, 328–29, 693 S.E.2d 719, 721 (2010)). A party may waive a condition precedent for its benefit by intentionally and voluntarily relinquishing it. *See Gore v. Myrtle/Mueller*, 362 N.C. 27, 38, 653 S.E.2d 400, 408 (2007); *Fairview Developers, Inc. v. Miller*, 187 N.C. App. 168, 173, 652 S.E.2d 365, 369 (2007) (citing *McNally v. Allstate Ins. Co.*, 142 N.C. App. 680, 683, 544 S.E.2d 807, 809 (2001) (subsequent history omitted)).

42. Waiver is a question of intent, and "[t]he intention to waive may be expressed or implied from acts or conduct that naturally lead the other party to believe that the right has been intentionally given up." *Klein v. Avemco Ins. Co.*, 289 N.C. 63, 68, 220 S.E.2d 595, 599 (1975). "There can be no waiver unless so intended by one party, and so understood by the other, or one party has acted as to mislead the other." *Harris & Harris Constr. Co. v. Crain & Denbo, Inc.*, 256 N.C. 110, 119, 123 S.E.2d 590, 596 (1962). Express waiver is voluntary and intentional whereas implied waiver is evidenced by a party's decisive, unequivocal conduct from which an intent to waive may reasonably be inferred. *Express Waiver*, Black's Law Dictionary (10th ed. 2014); *Implied Waiver*, Black's Law Dictionary.

43. Tumlin has not argued that the Firm expressly waived the Notice Requirement. Rather, he contends that waiver must be implied from Hamilton's acceptance of the June 5 departure date when Hamilton knew of the condition precedent and knew that June 5 was less than 30 days after Tumlin first announced

his intent to resign on that date.[2] Tumlin asserts that "Mr. Hamilton's express words and conduct *illustrate* that Tuggle Duggins agreed to accept the status and validity [of] Mr. Tumlin's departure by voluntary resignation without providing the 30-day notice and thus relinquished its known right to enforce that provision against Mr. Tumlin." (Br. Opp'n Summ. J. 16 (emphasis added).)

44. In a further effort to avoid summary judgment, Tumlin also argues that the Firm must not be allowed to rely on the Notice Requirement because Hamilton had an affirmative obligation to inform Tumlin that his resignation date did not comply with the Notice Requirement before formally accepting his resignation. (Br. Opp'n Summ. J. 16.)

45. North Carolina recognizes implied waiver by forbearance, acceptance, and acquiescence, but not by silence absent some affirmative duty to speak. In light of Tumlin's multiple factual arguments in support of a finding of waiver, the Court must now draw attention to the linguistic and legal variances between "silence" and "forbearance," and between "acquiescence" and "acceptance" to consider whether the evidence offered by Tumlin is sufficient to justify submitting the issue of waiver to a jury under North Carolina law.

---

[2] While the Firm Policy states "[t]he *written notice* required by this Paragraph *shall be given a minimum of thirty (30) days in advance of the effective date of termination* of employment by voluntary separation," (Firm Policy ¶ 6 (emphasis added)), because Tumlin first expressed his intent to resign by June 5 on May 18—also less than 30 days from June 5, the fact that Tumlin did not tender his written notice until May 19 does not change the potential legal effect of Hamilton's alleged oral agreement to the June 5 date on May 18.

46. Silence is "a restraint from speaking." *Silence*, Black's Law Dictionary. "Mere silence at a time when there is no occasion to speak is not waiver, nor evidence from which waiver may be inferred, especially where such silence is unaccompanied by any act calculated to mislead."[3] *Brittain v. Taylor*, 168 N.C. 271, 276, 84 S.E. 280, 282 (1915) (citation omitted); *see also Clemmons v. Nationwide Mut. Ins. Co.*, 267 N.C. 495, 504–05, 148 S.E.2d 640, 647 (1966) (finding that, where the insured advised her insurance company that she was being sued, the insurer's silence and failure to direct the insured how to comply with a condition precedent to her policy was insufficient evidence to support a finding that the insurance company knowingly and intentionally waived its rights); *Meekins v. Aetna Ins. Co.*, 231 N.C. 452, 456, 57 S.E.2d 777, 780 (1950) (finding that, if there has been a breach of its policy, an insurance company may choose to waive the forfeiture by express or implied waiver, but "[a] waiver cannot be inferred from its mere silence").

47. Tumlin has presented no evidence upon which the Court should impose a duty to speak on the Firm or on Hamilton on the Firm's behalf. The Court agrees with Tuggle Duggins' position that Hamilton's failure to inform Tumlin of the Notice Requirement at any time the two were discussing Tumlin's resignation cannot be the basis upon which a jury finds waiver under North Carolina law. (*See* Def.'s Mem. Additional Authority Issue Waiver 4, ECF No. 73.)

---

[3] By voluntarily dismissing his fraud claim, Tumlin has abandoned any argument that Hamilton sought to induce an insufficient notice in order to defraud Tumlin of any right of post termination compensation.

48. Likewise, it follows that Tumlin has not shown any basis for waiver due to an act of forbearance. *See McNally*, 142 N.C. App. at 683, 544 S.E.2d at 810 (stating that waiver occurs "where one in possession of any right . . . and of full knowledge of the material facts, does or forbears the doing of something inconsistent with the existence of the right") (quoting *Danville Lumber & Mfg. Co. v. Gallivan Bldg.*, 177 N.C. 103, 107–08, 97 S.E. 718, 720 (1919)). Forbearance is "[t]he act of tolerating or abstaining. The act of refraining from enforcing a right, obligation or debt. Strictly speaking, *forbearance* denotes an *intentional negative act*, while omission or neglect is an unintentional negative act." *Forbearance*, Black's Law Dictionary (emphasis in original); *see Christenbury Eye Ctr.*, 2015 NCBC LEXIS at *11 (finding at the 12(b)(6) stage that Christenbury waived future enforcement of its rights where it was on notice of its rights but "neither complained of nor insisted on" them being acknowledged even though it had the opportunity to do so); *see also Am. Hardware Mut. Ins. Co. v. BIM, Inc.*, 885 F.2d 132, 141 (4th Cir. 1989) (finding that where paying a percentage of anticipated premiums was a condition precedent to coverage under an insurance policy, by delaying sending a notice of cancellation on the policy after receiving a bad check from BIM for two months, "a reasonable trier of fact could conceivably conclude that American Hardware imposed on itself a 'duty to speak' more quickly than it did . . . [and] that the company's prolonged silence constituted a violation of that duty . . . .").

49. Obviously, when allowing Tumlin to depart less than 30 days from the time he provided written notice, Tuggle Duggins elected to forgo any benefit it would

have otherwise enjoyed by insisting that Tumlin remain during the 30 day period. It does not follow, however, that the Firm has waived the Notice Requirement by the same conduct. There is no reasoned basis to conclude that the benefit of the Notice Requirement to the Firm—having adequate time to discuss a departure with its clients and make adequate arrangements—is quid pro quo with a departing attorney's entitlement to post-termination compensation. The consequence of a departing attorney's failure to give adequate notice is the attorney's relinquishment of the right to post-termination compensation. As such, the Firm Policy placed an affirmative obligation on Tumlin to give proper notice to Tuggle Duggins. It does not follow that Tuggle Duggins was also obligated to ensure that proper notice was given to it.[4] In sum, the Firm's failure to insist on notice does not constitute forbearance supporting a finding of waiver. Therefore, Tumlin must prove waiver on a different basis.

50. In North Carolina, waiver may additionally be inferred from acceptance or acquiescence. *See Danville Lumber*, 177 N.C. at 107, 97 S.E. at 720; *see also Hill*

---

[4] While not dispositive or even persuasive in any way, the Court notes Tumlin's assertion that he was unaware of the Notice Requirement as he had no recollection of having been provided the Firm Policy during his employment. Tumlin claims that his first knowledge of the Firm Policy was when Hamilton sent it to him in September 2015. (Tumlin Aff. ¶ 6.) As an initial matter, the Court notes that Tumlin must have been aware that there was some policy at the Firm regarding post-termination compensation, as he quickly asserted a right to compensation that could not be independently derived from the Offer Letter. Additionally, Tumlin is presumptively charged with knowledge of the Firm Policy, particularly as a member of the Firm's executive committee and as an overseer of another director's departure on a prior occasion. In any event, the record demonstrates that Tumlin received a copy of the Firm Policy via e-mail on Tuesday, December 16, 2008. (*See* Ex. 10, at 1.) But, again, Tumlin's knowledge of the Notice Requirement, or his lack of it, does not control whether he was required to satisfy it as a condition precedent.

*v. Atlantic & N. C. R. Co.*, 143 N.C. 539, 557, 55 S.E. 854, 860 (1906) ("The acquiescence of one who might have taken advantage of an error obviates its effect . . . ."); *Frank v. Wilson & Co.*, 24 Del. Ch. 237, 245, 9 A.2d 82, 87 (1939) ("[A]cquiescence is a species of waiver."). The difference between acceptance and acquiescence is a matter of degree. Acquiescence is merely "passive acceptance or submission." *Acquiescence*, Merriam-Webster Dictionary (2016). Though it is present, case law discussing waiver by acquiescence in North Carolina is unfortunately sparse.

51. In North Carolina case law, acquiescence is almost always discussed in the context of real estate transactions and has primarily (if not exclusively) been evaluated as evidence of implied waiver where that acquiescence was to a breach, not a condition precedent, and that breach was followed by continued performance by the acquiescing party consistent with the contract. *See, e.g.*, *Vernon v. R. J. Reynolds Realty Co.*, 226 N.C. 58, 61, 36 S.E.2d 710, 712 (1946) (finding that homeowners benefiting from a real estate covenant could acquiesce to a change in conditions "to such an extent as to constitute a waiver"); *Treadwell v. Goodwin*, 14 N.C. App. 685, 690, 189 S.E.2d 643, 646–47 (1972) ("[T]he lessor's acceptance, without objection, and his acting upon a notice not given within the required time, constitute a waiver. A waiver will be implied where the lessee remains in possession and pays the rent to the lessor with the acquiescence of the latter.") (quoting 50 Am. Jur. 2d Landlord and Tenant § 1186).

52. Here, there was no breach by Tumlin, but rather a failure of a condition precedent. As such, there was no further possibility of continued performance by Tuggle Duggins from which implied waiver could be inferred. *See Fletcher v. Jones*, 314 N.C. 389, 394, 333 S.E.2d 731, 735 (1985) (holding that the defendant waived the date that performance was due by making representations and assurances to the plaintiff that defendant was willing to perform after that date).

53. As the above case law suggests, there is no clear line of demarcation as to what does or does not constitute adequate evidence of waiver by acquiescence. "The difficulty is in the application of the doctrine [of waiver] to any given case." *Danville Lumber*, 177 N.C. at 108, 97 S.E. at 720–21. This is especially true of implied waiver because intent must often be inferred or deduced "with more or less certainty from the external and visible acts of the party and all the accompanying circumstances of the transaction . . . ." *H.M. Wade Mfg. Co. v. Lefkowitz*, 204 N.C. 449, 453–54, 168 S.E. 517, 519 (1933); *see also Guerry v. Am. Trust Co.*, 234 N.C. 644, 648, 68 S.E.2d 272, 274 (1951) (citations omitted) ("A person may . . . dispense with the right by . . . conduct which naturally and justly leads the other party to believe that he has so dispensed with the right."). The Court's task is made all the more difficult by the fact that the discussions in the few North Carolina cases addressing claims of implied waiver are meager in depth.

54. Although Hamilton denies he ever expressly agreed to Tumlin's June 5 departure, Tumlin has presented evidence that Hamilton expressly agreed to it during the May 18 Meeting and then later accepted the Resignation Letter containing

the same date. While the Court expresses no opinion as to whether Tumlin may ultimately prevail, it concludes that there is adequate evidence requiring the Court to submit the question of implied waiver to the jury. The Court summarizes that evidence, both contested and uncontested.

55. On May 14, 2015, Tumlin dropped by Hamilton's office to discuss his intent to resign. At the time of the May 14 Meeting, Hamilton was under the impression that Tumlin had not foreclosed the possibility of staying at Tuggle Duggins and was open to discussion on that point. (Hamilton Dep. 34:19–35:2.) According to Hamilton, the Notice Requirement was not discussed or even thought of because he was hoping that he could convince Tumlin to stay. (Hamilton Dep. 38:21–39:22.)

56. Tumlin also recollects that at the May 14 Meeting Hamilton told him to hold off on making an announcement to the Firm about his departure because Hamilton wanted an opportunity to speak with Tumlin about his resignation again. (Tumlin Dep. 51:18–25.) However, according to Tumlin, there was discussion about picking a date for his departure, and while Hamilton and he briefly discussed the timing of Hamilton's upcoming June vacation, they did not settle on a date for Tumlin's departure at that time. (Tumlin Dep. 52:1–15.)

57. During the May 18 Meeting, Hamilton and Tumlin discussed Tumlin's resignation over lunch. (Hamilton Dep. 24:23–25.) Tumlin claims that Hamilton asked him to stay, but that they then discussed their respective schedules and Tumlin's workload, following which Hamilton "agreed that the [F]irm would accept

the departure date of 5 June 2015." (Tumlin Aff. ¶ 3.)  According to Tumlin, Hamilton specifically noted that he would be on vacation on June 5, but that he did not need to be there for Tumlin's last day.  (Tumlin Aff. ¶ 3; *see* Hamilton Dep. 19:9–10 ("I wasn't there for the last week or so of [Tumlin's] tenure.").)

58.     However, Hamilton firmly avows that there was no discussion about a particular date for Tumlin's departure at the May 18 Meeting.  (Hamilton Dep. 45:21–23, 56:6–8 ("[T]he first time I knew . . . his resignation date was when I got his letter.").)  Furthermore, according to Hamilton, any discussion between Tumlin and him regarding their respective schedules was general conversation unrelated to Tumlin leaving the Firm.  (*See* Hamilton Dep. 47:12–15.)  There was no discussion about the Notice Requirement on May 18.  (Hamilton Dep. 50:8–15.)

59.     The most significant divergence between Hamilton and Tumlin's recollections of the May 18 Meeting, and the most noteworthy to the issue of implied waiver, is that Tumlin recalled that they mutually agreed to the June 5 departure date.  Tumlin remembers telling Hamilton that he had several closings at the end of May so the earliest that he could leave was June 5.  (Tumlin Dep. 56:18–57:2.)  Tumlin says that he is certain that he is the one who introduced the June 5 departure date, but that Hamilton was "agreeable to that date," though Tumlin did not recall exactly what Hamilton said to express his agreement.[5]  (Tumlin Dep. 57:18–58:6.)

---

[5] Tuggle Duggins suggested that Tumlin tried to amend his version of what transpired at the May 18 Meeting in his deposition with his subsequently submitted affidavit.  The Court disagrees.  While it is true that "a party opposing a motion for summary judgment cannot create a genuine issue of material fact by filing an affidavit contradicting his prior sworn testimony," *Pinczkowski v. Norfolk S. Ry. Co.*, 153 N.C. App. 435, 440, 571 S.E.2d 4, 7 (2002),

Therefore, it is possible that a jury could find that Hamilton impliedly waived the Notice Requirement by orally and explicitly accepting Tumlin's June 5 departure date at the May 18 Meeting.

60.     Following the May 18 Meeting, Tumlin sent an e-mail with his Resignation Letter attached to Hamilton and Osteen on Tuesday, May 19, 2015. (*See* Tumlin Resignation E-mail & Letter.)  In the Resignation Letter, Tumlin stated,

> [t]hank you for taking the time to discuss my proposed departure from the Firm.  I truly appreciate the points you made about possible Firm changes and timing.  I have considered each of your points carefully.  Regardless, I have determined that it is in my best interest, both personally and professionally, to depart.
> . . .
> Several client closings are scheduled during the last week of May, so Friday, June 5, will be my last day at the Firm.  I am not that busy and that date should allow ample time to complete any post-closing matters and get my affairs in order.

(Tumlin Resignation E-mail & Letter at 3.)  Hamilton replied to Tumlin's e-mail four minutes later, beginning with "Wayne–acknowledging your letter to me today with notice [of] your resignation effective June 5th . . . ." (Tumlin Aff. Ex. C, ECF No. 68.2.) Hamilton believes that he was on the phone with Osteen when he received the Resignation Letter, and discussed his feelings of discontent over it with her. (Hamilton Dep. 52:7–53:10.)

61.     Hamilton states that he was surprised when he received the Resignation Letter almost immediately after the May 18 Meeting.  Even though Tumlin told

---

Tumlin merely stated in his affidavit that Hamilton indicated that "the [F]irm would accept the departure date of 5 June 2015," (Tumlin Aff. ¶ 3).  Tumlin made a statement to the same effect in his prior deposition.  In neither instance did Tumlin state the specific conduct or words that Hamilton used to communicate his agreement.

Hamilton that it was a "tough ask" to request that he stay at the Firm for another year, Hamilton says he countered by asking Tumlin to stay for at least a few months because the Firm was bringing in a consultant that might lead to changes at the Firm, thereby potentially assuaging Tumlin's concerns about staying. (Hamilton Dep. 45:13–20.) Furthermore, Hamilton inferred from the conversation that Tumlin was in no rush to leave as he told Hamilton that he had no plans on where he would go after departing the Firm or how to go about setting up an office. (Hamilton Dep. 45:1–7.) Tumlin too recalls discussing the consultant; however, he says that the issue was whether Hamilton still wanted Tumlin to meet with the consultant "notwithstanding the fact that [he] was leaving." (Tumlin Dep. 55:20–25.)

62. Viewing the evidence presented in the light most favorable to Tumlin, as the Court is required to do, the Court concludes that Tumlin has presented a forecast of evidence from which a jury could reasonably find that Tuggle Duggins' impliedly waived the Notice Requirement. There are obviously issues of credibility that only a jury may resolve.

63. Furthermore, the Court is mindful of the North Carolina Supreme Court's admonition that "[s]ince intent is an operation of the mind it should be proven and found as fact and is rarely to be inferred as a matter of law." *Lefkowitz*, 204 N.C. at 454, 168 S.E. at 519; *see Weyerhaeuser Co. v. Domtar Corp.*, 204 F. Supp. 3d 731, 740 (D. Del. 2016) (citation omitted) ("The question of waiver is normally a jury question, unless the facts are undisputed and give rise to only one reasonable inference."). Therefore, because there are issues of material fact regarding whether

the parties are bound by the Firm Policy, and whether Hamilton waived the Notice Requirement on behalf of Tuggle Duggins, the Firm is not entitled to summary judgment. *See Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 421 Md. 94, 123, 25 A.3d 967, 984 (2011) ("Given the highly factual nature of the waiver inquiry, it is an uncommon case in which the issue can be resolved by summary judgment.").

B. **The Court defers ruling on Tumlin's North Carolina Wage & Hour Act claim**

64.    Tumlin also asserts a claim to compensation under the North Carolina Wage and Hour Act (the "Wage & Hour Act"). The Wage & Hour Act governs, among other things, the payment of earned wages. N.C. Gen. Stat. § 95-25.1(b). Wages are defined as "compensation for labor or services rendered by an employee" and include "severance pay" and "other amounts promised when the employer has a policy or a practice of making such payments." § 95-25.2(16). An employee is simply defined as "any individual employed by an employer." § 95-25.2(4). The Wage & Hour Act requires that:

> employees whose employment is discontinued for any reason shall be paid all wages due on or before the next regular payday . . . . Such wages may not be forfeited unless the employee has been notified . . . of the employer's policy or practice which results in forfeiture.

§ 95-25.7; *see* § 95-25.13 (listing requirements for adequate notice to employees).

65.    If an employee is entitled to recover unpaid wages under the Wage & Hour Act, then the employer owes the unpaid compensation plus interest at the legal

rate of eight percent per annum from the date that each amount first came due. *See* § 95-25.22(a); § 24-1. Additionally, a court shall award liquidated damages equal to the unpaid wages plus interest (effectively double damages plus interest), unless the employer shows that it had reasonable grounds to believe that it did not violate the Wage & Hour Act; then the court may award partial or no liquidated damages. § 25-22(a1). Finally, the court may award reasonable costs, fees, and attorneys' fees to a successful employee, or to the employer if the employee's action was frivolous. § 95-25.22(d).

66. Both parties agree that Tumlin was an employee of the Firm until his termination. (*See* Am. Answer ¶ 52.) However, under the present record, the nature and extent of the services that Tumlin is claiming compensation owed for under his Wage & Hour Act claim is somewhat unclear. Tumlin states that prior to his departure from the Firm, he "performed legal services for clients of the [F]irm," "billed fees to clients for such services and [the Firm] collected such fees," and that he was entitled to compensation for that work. (Tumlin Aff. ¶ 9.) Following his departure, Tumlin says that he continued to work on pre-billing, billing adjustments, production shifts, file transfers, and collection issues to help the Firm finish the fiscal year, and was not compensated for those services either. (Tumlin Aff. ¶ 8.)

67. However, most significantly, Tumlin has not adequately qualified the services underlying his claims as "wages," within the meaning of the Wage & Hour Act. Tumlin was a shareholder, director, and officer in addition to an employee at the time of his resignation. It is unclear pursuant to which of these statuses the

amounts he now claims are due to him should be attributed, and application of the statute may depend on that attribution. Consequently, material issues of fact remain which preclude the Court from deciding the Wage & Hour Act claim at summary judgment. At trial Tumlin will bear the burden of producing evidence of specific services performed, demonstrating that those services are employee services under the Wage & Hour Act, and the value of those services. The Court need not consider remedies or defenses under the Wage & Hour Act until Tumlin first proves a basis for the Act to apply.

### C.      The Court defers ruling on Tumlin's unjust enrichment claim

68.     In the alternative to his breach of contract claim, Tumlin contends that Tuggle Duggins was unjustly enriched by his services. By its nature, the claim is an alternative to a contract claim, and is not a substitute for liability where the claim is the subject of a contract but a breach of that contract has not been proven. Unjust enrichment is a claim in quasi or implied contract, *see Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988), that arises when one party renders services for the benefit of another without an express contract and the law implies a promise to pay fair compensation. *Atlantic Coast Line R.R. Co. v. State Highway Comm'n of N.C.*, 268 N.C. 92, 95–96, 150 S.E.2d 70, 73 (1966). A claim for unjust enrichment requires the plaintiff to prove that: (1) the plaintiff conferred a benefit on another party, (2) the other party consciously accepted the benefit, and (3) the benefit was not conferred gratuitously or by an interference in the affairs of the other party. *See Islet Scis., Inc. v. Brighthaven Ventures, LLC*, No. 15 CVS 16388, 2017 NCBC LEXIS 4, at * 16 (N.C.

Super. Ct. Jan. 12, 2017) (citing *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002)).  If there is an express contract between the parties, it will govern and the law will not imply one.  *See Booe*, 322 N.C. at 570, 368 S.E.2d at 556; *see also Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 713, 124 S.E.2d 905, 908 (1962).

69.    Tumlin claims that the Firm has been unjustly enriched in an amount in excess of $300,000 because he worked for ten months for the fiscal year of 2015, and while the Firm billed and collected revenue for that work, Tumlin has only been partially compensated for it.  (Compl. ¶¶ 47–49; Tumlin Aff. ¶¶ 8–9.)  On its face, this appears to be a restatement of Tumlin's contract claim, and as such, an unjust enrichment claim would not normally lie.  However, Tumlin additionally avers that he continued to do work for the benefit of the Firm following his departure by "reviewing pre-bills, billing adjustments, production shifts, transfer of files, and collection issues" all at the behest of Osteen.  (Tumlin Aff. ¶ 8.)  These matters are extra-contractual, however, it is not presently clear whether Tumlin provided those services gratuitously or because his professional obligations required that he do so.

70.    North Carolina law allows a plaintiff to plead alternative theories of recovery based on the same conduct or transaction.  *See* N.C. Gen Stat. § 1A-1, Rule 8(e)(2). While Tumlin cannot use an unjust enrichment claim to insulate his potential failure to prove his contract claim, it is not clear at this time whether his evidence presented at trial will include gratuitous extra-contractual services, the value of

which the Firm accepted. Therefore, the Court defers its final consideration of the unjust enrichment claim until the evidentiary record is fully presented at trial.

**D.    The Notice Requirement is not void as a matter of public policy**

71.    Finally, the Court considers Tumlin's contention that the Notice Requirement violates public policy because it constitutes a harmful and arbitrary restriction on clients' rights to select legal counsel and creates an unreasonable time restraint on lawyers who elect to leave the Firm. (Br. Opp'n Summ. J. 20.) Tuggle Duggins rather contends that Tumlin's declaratory judgment claim will be completely determined by his breach of contract claim, so there is no case or controversy which cannot be resolved by an action for money damages. (*See* Am. Answer 9.)

72.    The power of the courts to enter declaratory judgments is a statutory one provided by the Uniform Declaratory Judgment Act (the "Declaratory Judgment Act"). *See* N.C. Gen. Stat. § 1-253. The Declaratory Judgment Act is "remedial" and "its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and it is to be liberally construed and administered." § 1-264. A declaratory judgment action must involve an actual controversy, however, "plaintiffs are not required to allege or prove that a traditional cause of action exists against defendants in order to establish an actual controversy." *Goldston v. State*, 361 N.C. 26, 33, 637 S.E.2d 876, 881 (2006) (citation omitted) (internal quotation marks omitted). Furthermore, courts have the power to grant a declaratory judgment "whether or not further relief is or could be claimed." N.C. Gen. Stat. § 1-253.

73. Whether or not to afford a declaratory judgment to a party is a matter expressly within the discretion of the trial courts. *Augur v. Augur*, 356 N.C. 582, 587, 573 S.E.2d 125, 129–30 (2002) (citing N.C. Gen. Stat. § 1-257). "A declaratory judgment should issue (1) when [it] will serve a useful purpose in clarifying and settling the legal relations at issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding." *Conner v. N.C. Council of State*, 365 N.C. 242, 258, 716 S.E.2d 836, 846 (2011) (alteration in original) (quoting *Goldston*, 361 N.C. at 33, 637 S.E.2d at 881). "[A] declaratory judgment action is appropriate when it will 'alleviat[e] uncertainty in the interpretation of [a] written instrument[].'" *Integon Nat'l Ins. Co. v. Helping Hands Specialized Transp., Inc.*, 233 N.C. App. 652, 658, 758 S.E.2d 27, 32 (2014) (alterations in original) (citing *Danny's Towing 2, Inc. v. N.C. Dep't of Crime Control & Pub. Safety*, 213 N.C. App. 375, 382, 715 S.E.2d 176, 181 (2011)).

74. It is appropriate for a court to "determine the validity and enforceability of a contract under the Declaratory Judgment Act." *Bueltel v. Lumber Mut. Ins. Co.*, 134 N.C. App. 626, 630, 518 S.E.2d 205, 208 (1999) (noting the Court had held prior that a contingency fee contract was void as being against public policy pursuant to the Act); *see also Calhoun v. WHA Med. Clinic, PLLC*, 178 N.C. App. 585, 596, 632 S.E.2d 563, 570 (2006) (citing *Kadis v. Britt*, 224 N.C. 154, 158, 29 S.E.2d 543, 545 (1944)) ("[S]ince the determinative question is one of public policy, the reasonableness and validity of the contract is a question for the court . . . to be determined from the contract itself . . . .").

75.     A court may hold an agreement that is contrary to public policy illegal and void. *Cauble v. Trexler*, 227 N.C. 307, 311, 42 S.E.2d 77, 80 (1947). An agreement is against public policy if it tends to injure "the public confidence in the purity of the administration of the law." *Id.* In considering whether an agreement should be declared void a court "does not consider the advantages or interests of either party to the contract" but instead whether "injury to the public is substantial, and not theoretical or problematical." *Electrova Co. v. Spring Garden Ins. Co.*, 156 N.C. 232, 235, 72 S.E. 306, 307 (1911).

76.     In the present context, Rule 5.6 of the North Carolina Rules of Professional Conduct prevents an attorney from entering into an agreement which restricts his or her right to practice because it not only limits the professional autonomy of the attorney, but also limits the ability of the client to choose an attorney. N.C. Rules of Prof'l Conduct R. 5.6 cmt. 1 (2003); *see* NCSB 2007 Formal Ethics Opinion 6 (April 20, 2007) (finding that even where an agreement does not impose geographical or temporal restrictions on competitive activity, it is still unethical if it decreases the buy-back value of firm shares because the departing shareholder attorney retains clients of the firm); NCSB 2001 Formal Ethics Opinion 10 (Jan. 18, 2002) (finding that an agreement that reduces the amount of deferred compensation payable to a shareholder-attorney that departs a firm and engages in competitive activity within a 50-mile radius violates the rules because it creates a specific financial disincentive).

77. Tumlin suggests that the Firm Policy mandates a choice between two paths for a departing attorney: forfeit post-termination compensation by leaving in less than 30 days even if necessary to respond to client need, or compromise a client's interests by remaining with the Firm for the requisite 30-day period in order preserve a right to post-termination compensation. Having presented that stark choice, Tumlin argues that the Firm Policy must fail because it creates a disincentive for leaving and honoring the ethical obligation that an attorney has to her client. (Br. Opp'n Summ. J. 20–21.)

78. Tuggle Duggins counters that the Firm Policy does not create a financial disincentive because, by offering post-termination compensation conditioned on notice, it only confers a gratuitous interest in ongoing collections to which the departing attorney would not otherwise be entitled.

79. The Court has carefully considered the ethics opinions on which Tumlin relies and finds that the circumstances of this case are easily contrasted. This aspect of the Firm Policy differs with the agreements considered in the formal ethics opinions cited above, which both reduced the amount of compensation that shareholder-attorneys would otherwise be entitled to in the form of deferred compensation and share buy-back. In contrast, Tumlin acknowledges that the Firm bought back his share without any issue. (*See* Tumlin Dep. 42:21–23.)

80. Additionally, the Firm Policy does not restrict competitive activity by departing attorneys in any manner, and does not decline post-termination compensation on the basis that the departing attorney takes Firm clients. (*See* Def.'s

Summ. J. Br. 18–19); *see also* NCSB 2008 Formal Ethics Opinion 8 (Oct. 24, 2008) (finding that agreements dividing legal fees following an attorney's departure must be reasonable and not penalize the attorney for taking clients with her). Therefore, none of the factors that have informed the State Bar's decisions to declare attorney compensation agreements unethical in the past are present in this Firm Policy.

81. While it is possible in the abstract that in order to immediately provide services to a client with which the Firm has a conflict of interest an attorney would be required to relinquish post-termination compensation by leaving in less than 30 days, the North Carolina State Bar is not absolute regarding its prohibition of non-compete agreements for lawyers. Tuggle Duggins accurately points out that lawyers may sell law firms along with goodwill for a higher price so long as they do not compete with the firm in the immediate area. *See* N.C. Rules of Prof'l Conduct R. 1.17(a). Rule 5.6 also allows restrictions on retiring attorneys. *Id.* at R. 5.6(a). Neither party discusses the possibility that both the Firm and the departing attorney could reach an alternative agreement if extraordinary circumstances occurred so as to cause a competition between ethical duties owed by the departing attorney and compliance with the Notice Requirement. Therefore, a hypothetical extreme should not serve to nullify the Notice Requirement in the Firm Policy.

82. Because the Firm Policy does not create any restrictions on a departing attorney's ability to practice law, does not deny compensation on the basis that a departing attorney retains some of the Firm's clients, and does not create a financial disincentive because it does not deny compensation that an attorney would otherwise

be entitled to, the Notice Requirement does not contravene public policy. Tuggle Duggins' Motion on Tumlin's declaratory judgment claim is consequently granted.

## VI. CONCLUSION

83. For the reasons stated above, Tuggle Duggins' Motion is GRANTED in part, DENIED in part, and DEFERRED in part as follows:

a. GRANTED on Tumlin's breach of contract claim to the extent that it is predicated on the Offer Letter alone being the source of Tumlin's post-termination compensation rights;

b. DENIED on Tumlin's claim that his entitlement to post-termination compensation is derived from the Firm Policy;

c. DEFERRED on Tumlin's North Carolina Wage & Hour Act claim;

d. DEFERRED on Tumlin's unjust enrichment claim;

e. GRANTED on Tumlin's declaratory judgment claim.

84. On or before 30 days from the date of this Order & Opinion, the parties shall advise the Court of at least two dates in the first half of 2019 on which they will be prepared for trial, and submit a proposed schedule for any further pre-trial proceedings consistent with Business Court Rule 12.3. The Court will then set a date for trial.

SO ORDERED, this the 18th day of December, 2018.

/s/ James L. Gale

James L. Gale
Senior Business Court Judge